# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-2035/2180

_____

Nebraska Plastics, Inc.,

      Appellant/Cross-Appellee,

v.

Holland Colors Americas, Inc.,

      Appellee/Cross-Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
District of Nebraska.

_____

Submitted:  February 14, 2005
Filed: May 13, 2005

_____

Before MORRIS SHEPPARD ARNOLD, BOWMAN, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury awarded Nebraska Plastics over $1,800,000 on its claims against Holland Colors Americas ("HCA") for breach of implied warranties, negligent design, manufacture and supply, negligent misrepresentation and fraudulent concealment.  The jury also returned a verdict for HCA on its counterclaim for

approximately $50,000 in overdue payments. The district court[1] granted HCA's post-verdict motions for judgment as a matter of law on the issue of future damages and for a pro tanto settlement credit based on Nebraska Plastics' settlement with another defendant, reducing Nebraska Plastics' award to under $300,000. Nebraska Plastics appeals the district court's grant of the motions and the entry of judgment for HCA on its counterclaim, while HCA cross-appeals the submission of the negligent design, manufacture and supply claim to the jury. For the reasons discussed below, we affirm the rulings of the district court.

## I.      BACKGROUND

Nebraska Plastics is a producer of polyvinyl chloride (PVC) products, including PVC fencing. In 1993, Nebraska Plastics decided to develop colored PVC fencing. With no experience or expertise in producing outdoor colored PVC products, Nebraska Plastics recognized that it needed assistance. Therefore, Nebraska Plastics hired pigment supplier HCA to help develop the colored fencing, based on HCA's representation that it had the technical knowledge and resources to help Nebraska Plastics develop a quality product. Nebraska Plastics gave HCA its proprietary PVC formula to allow HCA to develop an appropriate pigmentation technology. HCA sales agent Dick Bushart instructed Nebraska Plastics on the equipment and procedures needed to add HCA's pigment during the fencing manufacturing process. Nebraska Plastics began producing colored fencing in 1996.

In 1997, Nebraska Plastics' customers and dealers began to complain that the colored fencing was weathering abnormally. Nebraska Plastics was obligated by its product warranty, and by a desire to maintain its good name in the market, to replace fencing that weathered abnormally. Nebraska Plastics alerted HCA immediately

---

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

about the abnormal weathering, and HCA assembled a technical team to address the problem.

By April 1998, HCA had determined the source of the problem. Nebraska Plastics' PVC formula for fencing included calcium carbonate, supplied by OMYA, Inc. ("OMYA"). Calcium carbonate is a common ingredient in white PVC products. However, it was known in the industry that calcium carbonate is an unsuitable ingredient for outdoor colored PVC products. PVC reacts with sunlight to form water-soluble material. The calcium carbonate in the PVC attracts moisture to the water-soluble material, causing it to wash away in rain. After the water-soluble material washes away, only a white surface remains, resulting in a faded or chalky appearance for the colored PVC.

HCA chose not to inform Nebraska Plastics that calcium carbonate was causing the abnormal weathering. Bushart knew that if Nebraska Plastics altered its PVC formula to remove calcium carbonate, it would also remove another ingredient that Bushart sold, and Bushart did not want to lose his sales commissions on that ingredient. Instead, at the urging of Bushart, HCA's technical team told Nebraska Plastics that expensive changes in Nebraska Plastics' equipment and manufacturing process would solve the problem. HCA was fully aware that, even if Nebraska Plastics implemented the changes, the abnormal weathering would continue as long as calcium carbonate was included in Nebraska Plastics' PVC formula.

Naturally, even after making the changes recommended by HCA, Nebraska Plastics continued to receive warranty claims from fading and "chalking" of the colored fencing. Nebraska Plastics sought information from other consultants and learned that calcium carbonate was causing the problem. In August 2000, Nebraska Plastics reduced the calcium carbonate in its formula from eight parts per hundred to three; five months later, they completely eliminated calcium carbonate from the formula. Nebraska Plastics has yet to receive a complaint of abnormal weathering

related to fencing manufactured after the reformulation. Nebraska Plastics sold a total of 9,893,437 pounds of defective fencing between 1996 and 2001.

When Nebraska Plastics questioned HCA about the new information Nebraska Plastics had received regarding calcium carbonate, HCA initially was evasive. In February 2001, visiting HCA technical personnel finally "hinted" to Nebraska Plastics that calcium carbonate was indeed the source of the problem. Those HCA personnel were rebuked by Bushart.

Nebraska Plastics brought suit against HCA and OMYA, the calcium carbonate supplier, in October 2001 for breach of express and implied warranties, negligent design, manufacture and supply, negligent misrepresentation and fraudulent concealment. HCA brought a counterclaim against Nebraska Plastics to recover payment for deliveries of pigment between March and June of 2001. The district court granted summary judgment to OMYA on the implied warranty of merchantability and negligent design, manufacture and supply claims. The remaining claims proceeded to jury trial.

In the early stages of trial, OMYA settled the remaining claims against it. The jury returned a verdict for Nebraska Plastics on all of its claims against HCA, except for breach of express warranty, and awarded damages totaling $1,811,590. Of that amount, $1,042,492 was awarded for colored fence warranty claims expected to be incurred in the future. The jury also returned a verdict for HCA on its counterclaim.

Following the jury verdict, the district court granted HCA's motion for judgment as a matter of law ("JAML") on the issue of future damages. In addition, the district court granted HCA's motion for a pro tanto settlement credit, reducing the damages against HCA by the amount Nebraska Plastics received in the OMYA settlement. As a result, the judgment against HCA was reduced to $269,098. Finally,

the district court entered judgment on HCA's counterclaim against Nebraska Plastics for $50,722.

Nebraska Plastics appeals the exclusion of the testimony of its expert on future damages, the grant of JAML to HCA on future damages, the grant of a pro tanto settlement credit to HCA and the entry of judgment for HCA on its counterclaim. HCA cross-appeals the submission of the negligent design, manufacture and supply claim to the jury.

## II.    DISCUSSION

### A.    Excluded Expert Testimony

Nebraska Plastics expert William Cheese offered future damages testimony in which he attempted to estimate the cost to Nebraska Plastics of customer warranty claims expected to be received in the future for defective colored fencing.  After a pre-trial hearing, the district court excluded Cheese's opinions because they did not fit the facts of the case.  "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (quoting *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 296 (8th Cir. 1996)).  We evaluate the district court's understanding of the evidence at the time the district court made the ruling. *See Old Chief v. United States*, 519 U.S. 172, 182 n.6 (1997) ("It is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.").

Cheese calculated future damages by assuming that every pound of colored fence produced between 1996 and 2001 would be subject to a warranty claim.[2] The district court did not abuse its discretion in concluding that Cheese's assumption was invalid in view of the facts of the case. Specifically, the district court noted that, while Nebraska Plastics' evidence did show that all colored fencing with calcium carbonate would eventually fade, it did not demonstrate that every pound of fencing would fade to the point of being subject to a valid warranty claim. In fact, at the time of the district court's order excluding Cheese's testimony in November 2003, warranty claims had been filed on only 3.5% of the total colored fencing produced with calcium carbonate. Other evidence suggested that the rate of chalking would vary with regional climate differences and that the chalking would be more noticeable with some fence colors than with others. Cheese's estimate of future damages addressed none of these relevant facts.[3]

_____

[2]Some of the defective fencing was covered by a ten-year warranty, and some of it was covered by a twenty-year warranty. All warranties were limited to the original purchaser. Cheese used census data for the average length of ownership of non-commercial real estate, nine years, as an estimate of how long the original purchaser would retain the fencing. As a result, Cheese reduced his estimate of the amount of defective fencing that would be eligible for replacement under a twenty-year warranty to 9/20, or 45%. However, as the district court noted, the 45% assumption for warranty coverage also did not fit the facts of the case because it was derived from the assumption that all fencing would fade to the point of being subject to a warranty claim. In addition, not all fencing was purchased for non-commercial real estate and there was no reason to assume that all fencing was purchased at the beginning of the proposed nine-year average period of ownership.

[3]Nebraska Plastics did not proffer an "historical warranty claim analysis" to determine how those facts would affect the expected number of future warranty claims. An "historical warranty claim analysis" uses statistical methods to predict, with a demonstrable degree of confidence, the amount of product expected to be the subject of future warranty claims, based on data from existing warranty claims and the overall sales distribution of defective product.

We agree with Nebraska Plastics that "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). However, it also is true that if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded. *Id.* An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported:

> If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate. Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case.

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (citations and footnote omitted).

Cheese's calculation of future damages failed to take into account a plethora of specific facts tending to show limits on the amount of defective fencing that would be the subject of future warranty claims. Therefore, we conclude that the district court did not abuse its discretion in excluding Cheese's testimony.

## B. JAML on Future Damages

At the close of evidence in the jury trial, HCA moved for JAML on the issue of future damages. The district court reserved ruling on the motion until after the verdict. The jury returned a verdict against HCA which included $1,042,492 in future damages. After additional briefing by the parties, the district court granted HCA's motion for JAML, concluding that there was not sufficient evidence from which the

jury could have calculated Nebraska Plastics' future damages with reasonable certainty.

We review the grant of JAML de novo, applying the same standards used by the district court. *Arabian Agric. Servs. v. Chief Indus.*, 309 F.3d 479, 482 (8th Cir. 2002). "[J]udgment as a matter of law should not be granted unless 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)). "In applying this standard, we must 'draw all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence.'" *Id.* (quoting *Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001)). "A reasonable inference is one which may be drawn from the evidence without resort to speculation. Thus, judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict." *Id.* (citations omitted).

The parties agreed in their briefs to the district court that the issue of future damages is governed by Nebraska law as set forth in *Pribil v. Koinzan*, 665 N.W.2d 567 (Neb. 2003). The relevant language from *Pribil* is as follows:

> [T]he initial question of law for the trial court is whether the evidence of damages provides a basis for determining damages with reasonable certainty, i.e., the evidence of damages is not speculative or conjectural. If the evidence does provide such a basis, the issue of damages can be submitted to the jury.

*Pribil*, 665 N.W.2d at 573. In other words, under Nebraska law, "a plaintiff's evidence of damages may not be speculative or conjectural and must provide a reasonably certain basis for calculating damages." *Id*. at 572. We agree with the district court's conclusion that several missing pieces of evidence prevented a reasonably certain computation of the expected amount of future warranty claims.

First, there was insufficient evidence to allow the jury to determine the temporal limits of the warranty coverage of the defective fencing. For example, the jury had no means to determine what proportion of the defective fencing was covered by a ten-year warranty as opposed to a twenty-year warranty. Nebraska Plastics represented that only the fencing produced in 1996 was subject to the shorter warranty, representing 6.4% of the total defective fencing sold. However, Nebraska Plastics also introduced a warranty-claim letter from a customer who purchased fencing in 1999 which refers to the customer's "ten-year warranty."

Second, the warranty also limited coverage to the original purchaser, but Nebraska Plastics presented insufficient evidence to assist the jury in determining how long the original purchaser would be expected to own the fencing. The non-transferability of the warranty would presumably limit the effective period for warranty coverage in many cases, but the jury was not provided with any evidence that would enable a reasonable estimate of the effective coverage period.

Third, the rate of "chalking" of the fencing was unquantified. Nebraska Plastics' evidence indicated the rate of chalking would vary with regional climate, but no evidence was presented to help the jury quantify those regional variations. Even if adequate evidence regarding the duration of warranty coverage had been introduced, the jury had no basis for a reasonable estimate of what proportion of the defective fencing would fade to the point of creating a valid warranty claim before termination of the warranty.

Fourth, even if the jury had been able to estimate the number of potential warranty claims, the jury was given no guidance to estimate the proportion of customers with timely potential warranty claims who would actually choose to pursue those claims. Nebraska Plastics' evidence showed that some customers with abnormally weathered fences had chosen not to make warranty claims against

Nebraska Plastics. Nebraska Plastics presented no statistical analysis regarding what proportion of customers would be expected to pursue a timely claim if they had one.

Nebraska Plastics argues that Exhibit 330, when combined with the jurors' personal knowledge and common sense, contains all the purportedly "missing" information. Exhibit 330 is a list of thirty-three existing warranty claims and four potential warranty claims. For each claim, Exhibit 330 lists the fencing manufacture date, warranty claim date, fence color and fence location. Nebraska Plastics believes that in choosing a dollar figure for future damages, the jury must have extrapolated those 37 raw data points into "reasonably certain" statistical data to determine what proportion of the defective fencing would eventually become the subject of a warranty claim. However, Nebraska Plastics failed to establish that those 37 fences constituted a statistically meaningful sample of the almost ten million pounds of defective fencing sold.

Furthermore, Nebraska Plastics' evidence provided the jury no guidance on extrapolating the data on existing claims in Exhibit 330 to the overall amount of fencing sold.[4] Without such guidance, the jury had no reasonably certain factual basis for computation of the probable loss. In *Racicky v. Farmland Indus., Inc*., 328 F.3d 389, 400 (8th Cir. 2003), this Court, applying Nebraska law, reversed a jury award of future damages because "[t]he financial data presented, though voluminous, was not accompanied by testimony explaining its significance." The Court stated, "We are at a loss to know how the jury here calculated the damages award." *Id.* at 398.

---

[4]As the district court observed in its order excluding Cheese's expert opinion, an "historical warranty claim analysis" accounting for relevant factors such as expected duration of ownership, rate of chalking, regional variations in rate of chalking and likelihood that a customer would assert a potential warranty claim would have been useful to the jury in this context. *See supra* note 3.

Here, as in *Racicky*, we are at a loss to know how the jury calculated the damages award. The jury's choice of $1,042,492 as the value of the future warranty claims had to result from sheer guesswork about the effective warranty coverage period, the speed of the weathering process, and the likelihood that a given customer with a timely potential warranty claim would actually pursue the claim against Nebraska Plastics.

We conclude that, because the jury had no reasonably certain factual basis for computation of the value of future warranty claims, the district court did not err in granting JAML to HCA on the issue of future damages.

## C. Settlement Credit

The district court granted HCA's motion to reduce the damages awarded against it dollar-for-dollar by the amount Nebraska Plastics received in the settlement with OMYA. Nebraska Plastics argues that HCA was not entitled to this pro tanto settlement credit under Nebraska law. We review the district court's interpretation of state law de novo. *Kolb v. Paul Revere Life Ins. Co.*, 355 F.3d 1132, 1134 (8th Cir. 2004).

The Nebraska Supreme Court explained Nebraska law on settlement credits in *Vowers & Sons v. Strasheim*, 576 N.W.2d 817 (Neb. 1998):

> In a breach of contract case, the ultimate objective of a damages award is to put the injured party in the same position he would have occupied if the contract had been performed, that is, to make the injured party whole. As a general rule, a party may not have double recovery for a single injury, or be made "more than whole" by compensation which exceeds the actual damages sustained. Where several claims are asserted against several parties for redress of the same injury, only one satisfaction can be had.

*Id.* at 825 (citations omitted).

The Nebraska Supreme Court also applied the *Vowers & Sons* pro tanto settlement credit rule in *Jameson v. Liquid Controls Corp.*, 618 N.W.2d 637 (Neb. 2000), a product liability case:

> [The plaintiffs] did not allege separate acts leading to separate injuries. Instead, they sought an unspecified amount of damages against these two defendants as redress for the injuries Richard suffered in the accident. The jury determined that as a result of the injuries which Richard had suffered in the accident, he was entitled to a total of $5 million in damages. Since the jury found that $5 million is Richard's total award of damages for the injuries which he sustained in the July 16 accident, to the extent he received satisfaction from [the settling defendant] for those same injuries, [the remaining defendant] is entitled to a pro tanto reduction of the judgment.

*Id.* at 644-45.

In its claims against OMYA and HCA, Nebraska Plastics asserted a single injury—customer warranty claims arising from the sale of defective colored PVC fencing. Nebraska Plastics made no attempt to prove "separate acts leading to separate injuries." *Id.* Therefore, in the absence of any conflicting considerations, Nebraska's pro tanto settlement credit rule should apply in this case.

Nebraska Plastics argues that other equitable considerations should trump the Nebraska pro tanto settlement credit rule in this case. HCA was guilty of fraudulent concealment, an intentional tort. In some states, statutes governing contribution among tortfeasors or general principles of equity have been held to deny intentional tortfeasors the benefit of settlement credits. *See Evans v. Dean Witter Reynolds, Inc.*, 5 P.3d 1043, 1050 (Nev. 2000) (collecting cases). Other states, however, "have concluded that the potential for double recovery by the claimant mandates that

[settlement credit] offsets be imposed," even if the party seeking relief is an intentional tortfeasor. *Id.* Because no Nebraska statute or decision has addressed the issue of settlement credits for intentional tortfeasors, our task is to predict how the highest court in Nebraska would decide the issue. *Ehlis v. Shire Richwood, Inc.*, 367 F.3d 1013, 1016 (8th Cir. 2004).

We conclude that the Nebraska Supreme Court would apply the pro tanto settlement credit rule in this case. It is true that Nebraska recognizes the general principle that a party with unclean hands may not obtain equitable relief, *see Olsen v. Olsen*, 657 N.W.2d 1, 4 (Neb. 2003), and that Nebraska does not allow intentional tortfeasors to seek contribution from joint tortfeasors, *see Royal Indem. Co. v. Aetna Casualty & Surety Co.*, 229 N.W.2d 183, 189 (Neb. 1975). However, Nebraska law on settlement credits has been predicated firmly on the principle of denying double recoveries to plaintiffs, not on the defendants' relative positions in equity. *See Vowers & Sons*, 576 N.W.2d at 825; *Jameson*, 618 N.W.2d at 644-45. As the district court noted, this is an action by a claimant seeking to be made whole for an injury, not an action for contribution by one tortfeasor against another. Therefore, we predict that in this case the Nebraska Supreme Court would apply the pro tanto settlement credit rule, based on Nebraska's well-settled policy of denying a double recovery to the claimant.

Nebraska Plastics also notes that some amount of the OMYA settlement payment was paid in exchange for Nebraska Plastics' waiver of its right to appeal the partial summary judgment entered in favor of OMYA and for a confidentiality agreement. Nebraska Plastics contends that this amount, which was not identified in the settlement, should not be included in the settlement credit because it was not paid in compensation for Nebraska Plastics' injuries. However, the Nebraska courts did not reduce the settlement credits by those peripheral settlement amounts in similar situations in *Jameson* and *Vowers & Sons*, and there is no reason to anticipate a change of Nebraska law on this point.

Finally, Nebraska Plastics argues that the portion of the OMYA settlement paid to settle anticipated future damages should not be included in the settlement credit. Because we have denied the award for future damages against HCA, Nebraska Plastics contends that the future damages portion of the OMYA settlement is not duplicative of any part of the judgment against HCA and would not result in a double recovery. The settlement agreement does not identify the amount paid specifically for anticipated future damages.

Nebraska Plastics' argument that the purported "future damages" portion of the OMYA settlement is not duplicative fails. Nebraska Plastics brought an action against OMYA and HCA for the redress of a single injury. OMYA paid a lump sum to settle all potential liability before the extent of the injury was proved. We have now determined that future damages were not part of the actual damages proved by Nebraska Plastics. Because Nebraska Plastics only proved actual damages of approximately $770,000, any recovery beyond that amount would constitute a double recovery, regardless of the potential categories of damages covered in the OMYA settlement. Nebraska Plastics correctly states that because OMYA anticipated a future damages award in its settlement, OMYA ultimately may have paid more than its fair share of the actual damages. *See Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 817 n.5 (8th Cir. 1992) ("As with any settlement, . . . the parties take the risk that the jury's verdict would have been more favorable."). This fact, however, does not allow Nebraska Plastics to avoid the Nebraska rule that the plaintiff may not "be made 'more than whole' by compensation which exceeds the actual damages sustained." *Vowers & Sons*, 576 N.W.2d at 825.

We conclude that the district court did not err in granting HCA's motion to reduce the damages awarded against it dollar-for-dollar by the amount Nebraska Plastics received in its settlement with OMYA.

## D.  HCA's Counterclaim

HCA counterclaimed against Nebraska Plastics to recover payment for pigment it delivered to Nebraska Plastics between March and June 2001.  The jury found for HCA on that claim and awarded $50,722 to HCA.

Nebraska Plastics argues that the jury verdict on HCA's counterclaim was not supported by sufficient evidence and that it was inconsistent with the jury verdicts on Nebraska Plastics' claims against HCA.  Nebraska Plastics concedes that it did not raise the necessary objections to preserve these arguments below.

A party waives a claim of inconsistent verdicts by failing to object to the inconsistency before judgment is entered.  *Dairy Farmers of Am., Inc. v. Travelers Ins. Co.*, 391 F.3d 936, 945 (8th Cir. 2004).  Nebraska Plastics did not object below to the jury verdict on the counterclaim as being inconsistent with the jury verdicts on Nebraska Plastics' claims against HCA.  Therefore, to the extent Nebraska Plastics bases its argument on inconsistency of the verdicts, it has waived its argument.

To the extent Nebraska Plastics argues insufficiency of the evidence on the counterclaim, Nebraska Plastics concedes that the district court's entry of judgment may be reviewed only for plain error.  "Plain error review is narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings," and "[t]he verdict should be reversed only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected."  *Chem-Trend, Inc. v. Newport Indus.*, 279 F.3d 625, 629 (8th Cir. 2002) (quotations omitted).

Nebraska Plastics has made no showing that the verdict for HCA on the counterclaim prejudiced its substantial rights.  The claim was for the price of pigment delivered between March and June 2001, after Nebraska Plastics had discovered the

problem and ceased the use of calcium carbonate in its colored fencing. Because the pigment that was the subject of the counterclaim did not contribute to any defective fencing, Nebraska Plastics' rights were not substantially prejudiced by a verdict that forced Nebraska Plastics to pay for that pigment.

We conclude that the district court's entry of judgment for HCA on its counterclaim does not constitute reversible error.

### E. Submission of the Negligent Design, Manufacture and Supply Claim to the Jury

In its cross-appeal, HCA argues that the district court erred in submitting Nebraska Plastics' negligent design, manufacture and supply claim to the jury because there was no "product" upon which to base the claim. HCA contends that the pigment it provided was not defective and its participation in the design of the fencing was not a "product." HCA argues further that even if its participation in the design of the fencing was a product, recovery on a negligent design theory for its "bad advice" would duplicate the recovery under the negligent misrepresentation and fraudulent concealment claims.[5]

---

[5]In its reply brief, HCA introduced the argument that the tort-based negligent design, manufacture and supply claim was precluded by the contract-based warranty claims under the "economic loss" doctrine. *See Nat'l Crane Corp. v. Ohio Steel Tube Co.*, 332 N.W.2d 39, 44 (Neb. 1983) (holding that "the purchaser of a product pursuant to contract cannot recover economic losses from the seller manufacturer on claims in tort based on negligent manufacture or strict liability in the absence of physical harm to persons or property caused by the defective product"). This argument was not raised by HCA in its opening brief, and Nebraska Plastics did not have a chance to respond to it. This Court does not consider issues first raised in a reply brief unless the appellant gives some reason for failing to raise and brief the issue in his opening brief. *Martin v. Am. Airlines, Inc.*, 390 F.3d 601, 608 n.4 (8th Cir. 2004). Therefore, HCA has waived its argument that the recovery of purely

Because HCA did not object with specificity to the relevant instructions, its arguments were not preserved below. HCA objected to the jury instruction for the negligent design, manufacture and supply claim only on the ground that there was "no evidence sufficient to warrant that instruction to the jury." HCA did not object to the jury instruction defining HCA's participation in the design process as a "product" or to the instruction for the negligent design, manufacture and supply claim as being "duplicative" of other claims. *See, e.g., Cross v. Cleaver*, 142 F.3d 1059, 1068 (8th Cir. 1998) ("[A] general objection is insufficient to preserve the specific objections to the instruction that the appellant may subsequently seek to raise on appeal.") (quotation omitted). Therefore, these arguments must be evaluated under the plain error standard of review. *Id.* The verdict will be reversed "'only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected.'" *Chem-Trend,* 279 F.3d at 629 (quoting *Rush v. Smith*, 56 F.3d 918, 922 (8th Cir. 1995)).

The district court's submission of the negligent design, manufacture and supply claim to the jury does not merit reversal under plain-error review. Nebraska Plastics hired HCA to provide pigment for its colored fencing based on HCA's representation that HCA would lend its expertise to the design process to create a quality final colored PVC product. Because HCA participated in the design of the colored fencing, the defectively designed fencing can serve as the predicate product for the negligent design claim. Furthermore, negligence in designing the colored fencing would not necessarily duplicate "bad advice" in negligently or intentionally failing to inform Nebraska Plastics of the calcium carbonate problem. For example, HCA performed weathering tests of the colored Nebraska Plastics fencing before sales commenced; these tests apparently failed to reveal any weathering problem. This would support a negligent design, manufacture and supply claim independent of the

---

economic damages under the negligent design, manufacture and supply claim was improper.

"bad advice" claims. On these facts, we cannot say that the submission of the negligent design, manufacture and supply claim to the jury would result in a miscarriage of justice if left uncorrected.

We conclude that the district court's submission of the negligent design, manufacture and supply claim to the jury does not constitute reversible error.

## III.  CONCLUSION

We conclude that the district court did not err in excluding the testimony of Nebraska Plastics' expert on future damages, granting judgment as a matter of law to HCA on future damages, granting HCA's motion for a pro tanto settlement credit, entering judgment for HCA on its counterclaim and submitting Nebraska Plastics' negligent design, manufacture and supply claim to the jury. Therefore, we affirm the judgment as entered by the district court.

_____