# United States Court of Appeals

### For the Eighth Circuit

_____

No. 12-3863

_____

Dawn Lawrey, Mother and Next Friend of Aubree Lawrey, a Minor

*Plaintiff - Appellant*

v.

Good Samaritan Hospital

*Defendant*

Kearney Clinic, P.C.; Dawn M. Murray, M.D.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: December 18, 2013
Filed: June 4, 2014

_____

Before BYE, BRIGHT, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

After Dawn Lawrey's daughter was born with permanent nerve damage in her right shoulder and arm, Lawrey brought a medical malpractice action against Dr.

Dawn Murray, the physician who performed the delivery. The case went to trial with a jury issuing a verdict in favor of Dr. Murray. Lawrey appeals claiming the district court[1] abused its discretion by excluding certain testimony from her experts prior to trial. Lawrey also argues she was entitled to judgment as a matter of law on the issue of informed consent; in the alternative Lawrey contends she should have been granted a new trial because of allegedly inflammatory and prejudicial statements Dr. Murray's counsel made in closing arguments. We affirm.

I

During a vaginal delivery, a newborn's shoulder can sometimes get stuck in the birth canal behind parts of the mother's anatomy. This condition is called shoulder dystocia. There are two places where a newborn's shoulder can get stuck. The first is behind the mother's sacral promontory, a part of the tailbone. When a newborn's shoulder gets stuck in this location, the condition is referred to as a posterior shoulder dystocia. A posterior shoulder dystocia occurs before the newborn's head has crowned.

The second place a newborn's shoulder can get stuck is behind the mother's pubic symphysis. The pubic symphysis is the fixed joint located at the front of the pelvic girdle, where the two pubic bones meet. It is not actually a bone, but is comprised of cartilage, so is similar to a bone in terms of its rigidity. This location is farther along the birth canal. When a newborn's shoulder gets stuck in this location, the condition is referred to as an anterior shoulder dystocia. An anterior shoulder dystocia occurs after the newborn's head has crowned. In fact, a newborn's head commonly retreats back into the birth canal after initially crowning if there is an anterior shoulder dystocia, a condition known as the turtle sign.

---

[1]The Honorable Laurie Smith Camp, Chief Judge, United States District Court for the District of Nebraska.

Shoulder dystocia can cause injury to the brachial plexus, the network of nerves running from the spinal cord to the shoulder and arm. These nerves can stretch or tear while the newborn's shoulder is becoming dislodged from behind the sacral promontory or the pubic symphysis. In those instances of shoulder dystocia when an injury does occur, the injury is usually temporary. In rare instances, the condition results in permanent injury.

Aubree Lawrey was born on March 1, 2008, with a permanent brachial plexus injury to her right shoulder and arm. The injury resulted from a posterior shoulder dystocia, meaning Aubree's shoulder got stuck behind her mother's tailbone, before her head had crowned. During prenatal visits with Dawn Lawrey, Dr. Murray had discussed the possibility of the baby getting stuck during the delivery. Dr. Murray had these discussions because of the problems Lawrey had during her first childbirth, and the anticipated size of the second baby. Although Dr. Murray discussed the possibility of the baby getting stuck during delivery, she did not mention the possibility of a permanent injury. Lawrey opted to have a vaginal delivery rather than a cesarean section.

After Lawrey realized her daughter's injury was permanent, she brought a medical malpractice action against Dr. Murray claiming the injury was caused by negligent treatment. She also claimed a lack of informed consent, alleging Dr. Murray was obligated to warn her of the possibility that a vaginal delivery could result in a permanent nerve injury, and if she had been informed of the possibility of permanent injury, she would have chosen to have a cesarean section.

As the suit progressed, Lawrey disclosed the reports of two expert physicians. Both physicians opined the injury resulted from Dr. Murray applying excessive lateral traction to Aubree's head during delivery, notwithstanding the fact that Aubree's shoulder had been stuck behind her mother's tailbone before her head had even crowned. Both experts further believed the maternal forces of labor (i.e., the mother

pushing) can never cause permanent nerve injuries of the type suffered by Aubree, and permanent injuries are always the result of excessive physician-applied traction (i.e., the doctor pulling).

Prior to trial, Dr. Murray filed a motion in limine seeking to preclude both of Lawrey's experts from testifying that maternal forces of labor cannot cause permanent brachial plexus injuries and that such injuries are always the result of excessive physician-applied traction. Dr. Murray further argued the two experts' testimony should be excluded because it did not fit the facts of this case, in that the medical records of the birth showed the delivery was not difficult, the delivery involved a posterior shoulder dystocia before the baby's head had crowned, and Dr. Murray did not apply excessive traction to Aubree's head or neck during the delivery.

The district court granted the motion in limine. The district court equated the two experts' testimony – brachial plexus injuries are always the result of physician applied traction – with essentially advancing a theory of *res ipsa loquitur* (i.e., a brachial plexus injury is an occurrence which would not happen in the absence of negligence). The district court determined the doctrine of *res ipsa loquitur* was inapplicable as a matter of law to the circumstances involved in this case because "[a]ll credible evidence before this Court suggests that brachial plexus injuries . . . can and do occur in a fixed percentage of births where no traction is applied by the birth attendant." The district court precluded the two experts "from offering any opinion that maternal expulsive forces *cannot* cause permanent brachial plexus injuries, or that birth-related brachial plexus injuries are *always* the result of traction applied to an infant's head and neck by the birth-attendant."

The district court further precluded the two experts from testifying "that the injury to Plaintiff Aubree Lawrey was caused by Defendant Dr. Murray applying excessive traction to infant Aubree's head and neck." Lawrey filed a motion for reconsideration, which was denied, with the district court noting there was no

-4-

evidence "to suggest Dr. Murray applied *any* traction to Aubree's head or neck during delivery[.]" In the absence of such evidence, the district court reiterated its belief the two experts were essentially advancing a theory of *res ipsa loquitur*.

With her experts prohibited from testifying about what they believed caused the injury, Lawrey proceeded at trial solely on the issue of a lack of informed consent. Lawrey argued the standard of care required Dr. Murray to warn her about the risk of a permanent brachial plexus injury. At trial, Dr. Murray said she warned Lawrey about the possibility of an injury to the child during a vaginal delivery, but admitted she failed to warn of the possibility of a permanent injury. Dr. Murray's expert testified, however, that such a warning was only required in the three situations mentioned in guidelines provided by the American Congress of Obstetricians and Gynecologists (ACOG). The ACOG guidelines advise physicians to consider performing a cesarean section to prevent possible permanent nerve damage from shoulder dystocia in three circumstances: (1) if the mother is diabetic and the baby weighs over 4500 grams (just short of ten pounds); (2) if the mother is non-diabetic but the baby weighs over 5000 grams (just over eleven pounds); or (3) if the mother had a prior delivery complicated by a severe shoulder dystocia or a birth-related brachial plexus injury. None of the three circumstances applied to Dawn Lawrey, so Dr. Murray's expert testified a warning about possible permanent injury was not required. The jury rendered a defense verdict in favor of Dr. Murray, concluding she did not violate the standard of care by failing to warn Lawrey about the possibility of a permanent injury to her child.

Lawrey filed a post-trial motion for judgment as a matter of law and, in the alternative, a motion for new trial. The motion for a new trial was brought, in part, on the grounds that defense counsel made improper and unfairly prejudicial comments during his closing argument. Specifically, Lawrey claimed it was improper and prejudicial for defense counsel to refer to plaintiff's counsel as "disingenuous, inaccurate, and non-forthright." Lawrey also claimed it was improper and prejudicial

for defense counsel to claim a plaintiff's verdict would send a message to other doctors to perform more cesarean sections than necessary in order to avoid being sued – "[t]he medical community is going to be listening to your verdict," and "the community needs to hear from you."  The district court denied both motions.

Lawrey filed a timely appeal.  On appeal, Lawrey contends the district court abused its discretion in granting the motion in limine precluding her experts from giving their opinion that the only possible cause of Aubrey's injury was excessive physician-applied traction.  Lawrey also claims she proved a lack of informed consent as a matter of law based on Dr. Murray's admission that she failed to warn about the possibility of a permanent injury, and thus the district court erred in denying her motion for judgment as a matter of law.  Finally, Lawrey contends the district court erred in denying the motion for a new trial on the grounds that defense counsel's closing argument was improper and unfairly prejudicial.

II

A

Lawrey first challenges the district court's pretrial order granting Dr. Murray's motion in limine, which limited the testimony Lawrey's experts could provide on the relationship between excessive physician-applied traction and brachial plexus injuries.  Before addressing the merits, however, we need to resolve a dispute over the proper standard of review.  Although we generally review the exclusion of expert testimony for an abuse of discretion, see, e.g., Sappington v. Skyjack, Inc., 512 F.3d 440, 448 (8th Cir. 2008), Dr. Murray argues we should apply the more stringent plain error standard in this case because Lawrey failed to make an offer of proof at trial regarding her experts' testimony.  Relying upon our decision in Smith v. Hy-Vee, 622 F.3d 904 (8th Cir. 2010), Dr. Murray contends Rule 103 of the Federal Rules of

Evidence requires a party to make an offer of proof at trial to preserve an objection to evidence excluded by a pre-trial motion in limine. We disagree.

A 2000 amendment to Rule 103 states "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error on appeal." In Hy-Vee, a divided panel of this court interpreted the amended rule as still requiring an offer of proof at trial after a definitive ruling on a motion in limine, reasoning that the rule refers to *renewing* an objection, and thus an *initial* offer of proof must be made before it can be renewed. See Hy-Vee, 622 F.3d at 909 ("The point we make here is that no offer of proof was ever made, not that one was not renewed."). Although our court en banc had construed the 2000 amendment as not requiring an offer of proof to preserve an objection when "the evidence was excluded pursuant to a motion in limine," Moran v. Clarke, 296 F.3d 638, 649 (8th Cir. 2002) (en banc), the Hy-Vee majority dismissed this comment as dicta, stating

> we cited no case in support of this proposition and we don't believe that the court intended to overrule our clear, contrary precedents on the matter, especially without discussion. In fact, the matter of whether a motion *in limine* had been made does not seem to have been in issue in Moran, so we think that the assertion there about offers of proof being unnecessary was inadvertent and dictum.

Hy-Vee, 622 F.3d at 909.

The Hy-Vee majority, however, overlooked several other Eighth Circuit decisions that had already considered whether – following the 2000 amendment – Rule 103 required an offer of proof at trial to preserve a claim of error following a definitive ruling on a pre-trial motion in limine. All those cases held the error was preserved without requiring an offer of proof at trial, essentially recognizing that the motion in limine itself (or the opposition to the same) served as the required objection

which the Hy-Vee majority found lacking. See Shelton v. Kennedy Funding, Inc., 622 F.3d 943, 958-59 & n.14 (8th Cir. 2010); United States v. Davis, 534 F.3d 903, 920-21 (8th Cir. 2008); United States v. Flenoid, 415 F.3d 974, 976 (8th Cir. 2005); United States v. Malik, 345 F.3d 999, 1001 (8th Cir. 2003); see also WWP, Inc. v. Wounded Warriors Family Support, Inc., 628 F.3d 1032, 1039-40 (8th Cir. 2011) (applying the above line of cases rather than the rule stated in Hy-Vee).

The Hy-Vee majority was not at liberty to disregard these prior panel decisions. See United States v. Reynolds, 116 F.3d 328, 329 (8th Cir. 1997) ("One panel may not overrule another."). Because Shelton, Davis, Flenoid and Malik were all decided prior to Hy-Vee, the reasoning expressed in these earlier cases is the correct statement of the law, not the contrary rule stated in Hy-Vee. See Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc) ("[W]hen faced with conflicting panel opinions, the earliest opinion must be followed as it should have controlled the subsequent panels that created the conflict.") (internal quotation marks and citation omitted). Because the order limiting the testimony of Lawrey's experts was the subject of a definitive motion in limine, Lawrey's counsel was not required to make an offer of proof at trial to preserve a claim of error on appeal. Thus, the proper standard for our review of the district court's order granting the motion in limine is abuse of discretion, not plain error.

Turning now to the merits, the district court precluded Lawrey's experts from testifying that the only possible cause of a brachial plexus injury is excessive physician-applied traction. The district court also precluded Lawrey's experts from testifying that the injury *in this case* was caused by Dr. Murray applying excessive traction to Aubree's head and neck during the delivery. Lawrey contends the district court abused its discretion in precluding her expert testimony, arguing the testimony was based on a comprehensive differential diagnosis which ruled in excessive physician-applied traction as the most likely cause of Aubree's injury, and ruled out maternal expulsive forces and other potential causes. Lawrey argues the district court

should have allowed her experts to testify because their testimony was based on a proper differential diagnosis. We disagree.

In Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410 (8th Cir. 2005), we examined whether a district court abused its discretion by excluding certain expert opinions "because they did not fit the facts of the case." Id. at 415. We noted the general rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility," but also said "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded." Id. at 416; see also Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056 (8th Cir. 2000) ("Even a theory that might meet certain Daubert factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case.") (footnote omitted).

Here, the opinions offered by Lawrey's experts did not fit the specific facts of this case. Brachial plexus injuries are caused by the force which dislodges a newborn's stuck shoulder and occur when the shoulder becomes dislodged. Aubree's injury resulted from a posterior shoulder dystocia which, as previously noted, occurs before a baby's head has crowned. This means the force which caused Aubree's injury must have been applied while her head and neck were still in the birth canal. Lawrey's experts failed to explain how Dr. Murray could or did apply traction to Aubree's head and neck while her head and neck were still in the birth canal. Lawrey's experts also failed to explain how any traction Dr. Murray allegedly applied after Aubree's head and neck exited the birth canal could have caused an injury which occurred before her head had crowned. In short, the testimony concluding Aubree's injury was caused by physician-applied traction to her head and neck simply did not fit the facts of this case. As a result, the district court did not abuse its discretion by excluding the testimony.

-9-

B

Lawrey next contends the district court erred when it denied her motion for judgment as a matter of law on the issue of informed consent. We review the denial of a motion for judgment as a matter of law de novo; the evidence is viewed in the light most favorable to the prevailing party and we do not reweigh the evidence or consider questions of credibility. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).

Lawrey contends Dr. Murray's expert testified the alleged risk factors present in this case required Dr. Murray to inform Lawrey of the possibility of a permanent injury to her child if she chose a vaginal delivery. Lawrey therefore claims she was entitled to judgment as a matter of law on the issue of informed consent because Dr. Murray admitted she did not warn Lawrey about the possibility of a permanent injury. Our review of the record does not support the contention that Dr. Murray's expert testified the risk factors present in this case required a physician to warn a patient about the possibility of a permanent injury.

As described above, the expert's testimony clearly conditioned the need to warn a patient about a permanent injury on whether the risk factors justifying such a warning were present. The risk factors outlined by Dr. Murray's expert tracked the ACOG guidelines for when a physician should consider performing a cesarean section to avoid the possibility of shoulder dystocia. None of the ACOG guideline risk factors (i.e., diabetic mother and baby weight over 4500 grams; non-diabetic mother and baby weight over 5000 grams; or prior delivery complicated by a severe shoulder dystocia or a birth-related brachial plexus injury) were present in this case. As a result, Lawrey was not entitled to judgment as a matter of law on the issue of informed consent, and the district court did not err in denying Lawrey's motion.

C

Finally, Lawrey contends the district court should have granted her a new trial based on allegedly prejudicial and inflammatory comments made by defense counsel during closing arguments. We review the denial of a motion for a new trial "for a clear abuse of discretion," only granting the motion when necessary "to avoid a miscarriage of justice." Harrison v. Purdy Bros. Trucking Co., Inc., 312 F.3d 346, 351 (8th Cir. 2002). When a new trial motion is based on improper closing arguments, "a new trial should be granted only if the statements are plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict." Id. (internal quotation marks and citation omitted). To the extent Lawrey claims defense counsel engaged in improper personal attacks impugning the character of plaintiff's counsel, there was no objection at trial and thus this claim is reviewed only for plain error. Manning v. Lunda Constr. Co., 953 F.2d 1090, 1092-93 (8th Cir. 1992).

Lawrey first claims defense counsel made prejudicial and inflammatory personal attacks on plaintiff's counsel by referring to him as "disingenuous, inaccurate, and non-forthright." It is not improper, however, for an attorney to tell the jury his opponent's argument is false or disingenuous if such statements are consistent with the facts developed at trial. See Sanden v. Mayo Clinic, 495 F.2d 221, 227 (8th Cir. 1974) ("Normally, it is improper for an attorney to argue before the jury that the case of his opponent is false or fraudulent. Yet here the supporting facts were developed at trial and the conclusion, if such evidence was believed, was at least a permissible one.") (internal citations omitted). In this case, Lawrey's counsel told the jury several times that Dr. Murray's own expert agreed Dr. Murray breached the standard of care by not informing Lawrey of the risk of permanent injury. As we noted above, however, the expert clearly conditioned the need to give such a warning on the presence of the risk factors outlined in the ACOG guidelines. Because none of those risk factors were present in this case, it was not improper for defense counsel

-11-

to argue the plaintiff's argument was unsupported by the record. We find no plain error present here.

Lawrey also claims defense counsel engaged in an inappropriate "send a message" argument when he said the "medical community is going to be listening to your verdict." See, e.g., Sinisterra v. United States, 600 F.3d 900, 910 (8th Cir. 2010) (generally explaining the impropriety of "send a message" closing arguments). We disagree this statement resulted in a miscarriage of justice that warrants a new trial. Our review of the record shows the comment was made in the context of asking the jury to determine the appropriate community standard of care. See, e.g., Stecker v. First Commercial Trust Co., 962 S.W.2d 792, 797 (Ark. 1998) (stating a mistrial was not warranted when it was at least plausible defense counsel's reference to "protecting the children" had to do with the standard of care rather than sending a message). In addition, the comment about the medical community listening to the jury's verdict comprised a very small portion of a lengthy closing argument properly commenting on the facts involved in the case, and thus was not the primary theme of the closing argument. The district court instructed the jury that statements by the attorneys were not evidence and the case should be decided based upon the facts presented at trial. See Anastasio v. Schering Corp., 838 F.2d 701, 706 (3d Cir. 1998) (concluding "isolated comments" in the context of an otherwise proper closing argument did not warrant a new trial, especially where the district court instructed the jury that counsels' statements were not evidence).

III

We affirm the district court.

BRIGHT, Circuit Judge, concurring.

I concur in the result but write separately to emphasize that, in my opinion, the decision to exclude the expert testimony in this case was a close call, but was not an abuse of the discretion afforded to the district court under the *Daubert* rule. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (charging district court judges with the responsibility of acting as gatekeepers to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable").

_____