# SOUTHEASTERN DISTRIBUTING CO. *v.*
# MILLER BREWING CO.

05-969 237 S.W.3d 63

Supreme Court of Arkansas
Opinion delivered June 15, 2006

[Rehearing denied September 7, 2006.]

*Tony L. Wilcox*, for appellant.

*Kelly Sue Terry*, for appellee.

JIM GUNTER, Justice. Appellant, Southeastern Distributing Company, Inc. ("Southeastern"), appeals an order of the Jefferson County Circuit Court granting summary judgment in favor of Miller Brewing Company ("Miller") and dismissing all of Southeastern's claims. We affirm in part and reverse and remand in part.

Southeastern operated a wholesale beer distributing company for Miller in southeastern Arkansas from 1977 until 2001. During that time, Charles "A.C" Freeman was the owner of Southeastern. Toward the end of 2000, George O'Conner, another Arkansas beer distributor, called Freeman and asked him if he would like to sell Southeastern. Freeman said no. On October 5, 2000, O'Conner met with representatives of Miller and indicated in an Arkansas Acquisitions book that he would like to buy Southeastern. In a telephone conversation in January 2001, Jim Young, a Miller representative, asked O'Conner if he would be interested in purchasing Southeastern. O'Conner replied that he was interested and had been interested for some time. Finally, on February 13, 2001, Young visited O'Conner at his office and discussed the potential acquisition by O'Conner of Southeastern.

On February 14, 2001, Young visited Freeman at Southeastern's offices. Southeastern had begun experiencing financial problems in 2000, which continued into 2001. As a result of these

problems, Southeastern missed payments to its suppliers, including Coors, Pabst, and Miller. Young asked Freeman about Southeastern's payment problems with Pabst, and they discussed the business's cash-flow issues. Freeman testified in his deposition that, after that discussion, Young asked him if he had ever considered selling his distributorship. Freeman stated that he asked, "Would you like for me to sell my distributorship?" Young allegedly replied, "Miller Brewing Company would like for you to sell your distributorship." Young indicated that he would provide Freeman with a list of potential purchasers. Freeman testified that he decided to sell his business right then because he knew it was futile not to do what Miller wanted with regard to its distributorships.

Immediately thereafter, Freeman hired a professional beer-industry consultant, Sam Boyer, to assist in marketing and in finding a buyer for Southeastern. Shortly thereafter, it became clear to Freeman that Miller wanted O'Conner to purchase Southeastern. Freeman testified that, several weeks after their meeting, he spoke with Young, who did not provide a list of potential purchasers, but who instead told Freeman that Miller wanted O'Conner to purchase Southeastern. Freeman testified that Young told him not to waste his time submitting letters of intent from other potential purchasers because Miller wanted O'Conner to buy Southeastern.[1]

Southeastern began contacting potential purchasers in March. While Southeastern did not contact O'Conner about the potential sale until late March, O'Conner told Pabst in early March that it had, or was close to having, a deal to purchase Southeastern. In a meeting to discuss a potential offer to purchase Southeastern, O'Conner told Boyer that he was wasting his time talking to other prospective purchasers because Miller had already identified him as the only buyer that it would approve. In response to several interested purchasers, Miller wrote letters in March stating that Miller was consolidating its distributor network and that there were no distributorships available in the geographic area encompassing Southeastern. In addition, Boyer and Freeman testified that while many potential purchasers initially considered buying Southeastern, most of the interest began to abate by early April.

---

[1] Pursuant to the Distributor Agreement between Southeastern and Miller, Miller must approve any proposed purchaser of Southeastern's distribution rights. To effect this approval, Southeastern is required to submit a nonbinding letter of intent signed by Southeastern and the proposed purchaser for Miller's review.

In a letter dated May 1, 2001, Miller threatened to terminate Southeastern for an alleged failure to pay for a shipment on time. Freeman testified that Young called him when Miller discovered that the payment had been made and told him Miller would reinstate Southeastern's credit if he would sell to O'Conner. While Freeman had received two offers in addition to O'Conner's offer, both of these offers contemplated Freeman providing part of the financing, which was not acceptable given the precarious financial position of Southeastern. Boyer and Freeman testified that they thought they could get a better offer for Southeastern if they continued to negotiate, but Freeman testified that he and Southeastern were too financially strapped for him to continue to negotiate for a higher price. If Miller were permanently to terminate Southeastern's credit, Freeman did not believe Southeastern would remain viable. Therefore, he claims that he was forced to accept O'Conner's offer on May 17, 2001. O'Conner paid $5.4 million for Southeastern. The sale closed in June 2001.

On October 20, 2003, Southeastern filed an amended complaint against Miller alleging (1) violations of the Arkansas Beer Wholesaler's Act; (2) violations of the Arkansas Franchise Practices Act; (3) fraud and deceit; (4) intentional interference with business expectancies; and (5) civil conspiracy. Essentially, Southeastern claims that it was unable to market its business freely and was forced to sell for substantially less than fair market value. Southeastern also sued O'Conner and his corporate entities, but has settled those claims. On June 27, 2005, the circuit court entered an order granting Miller's motion for summary judgment and dismissed all of Southeastern's claims against Miller. Southeastern filed this appeal.

## I. Rule 56

Southeastern's first point on appeal is that the circuit court violated the mandatory time restrictions contained in Rule 56 of the Arkansas Rules of Civil Procedure governing summary judgment. Specifically, Southeastern argues that the trial court improperly conducted a hearing on Miller's summary-judgment motion on April 4, 2005, instead of on or after April 20, 2005. Southeastern argues that the rationale for the time provisions set forth in Rule 56 is to ensure that the parties are provided adequate time to present the necessary evidence and argument and to ensure that the court is provided adequate time to review and consider the evidence and argument. Southeastern then quotes the Reporter's

notes to the 2001 Amendment to the Rule adding 56(c): Rule 56 "precludes the court from ruling on the motion until after the parties have had an opportunity to present their evidence." Ark. R. Civ. P. 56, Addition to Reporter's Notes, 2001 Amendment (2006).

Rule 56 states in pertinent part as follows:

(c) *Motion and Proceedings Thereon.* (1) The motion shall specify the issue or issues on which summary judgment is sought and may be supported by pleadings, depositions, answers to interrogatories and admissions on file, and affidavits. The adverse party shall serve a response and supporting materials, if any, within 21 days after the motion is served. The moving party may serve a reply and supporting materials within 14 days after the response is served. The court may by order enlarge the foregoing time periods. No party shall submit supplemental supporting materials after the time for serving a reply, unless the court orders otherwise. The court, on its own motion or at the request of a party, may hold a hearing on the motion not less than 14 days after the time for serving a reply.

Ark. R. Civ. P. 56(c)(1) (2006).

In this case, Miller filed its motion for summary judgment on February 2, 2005. Under Rule 56, Southeastern's response was due on February 23, 2005. However, the circuit court granted Southeastern an additional thirty days, until March 23, 2005, to serve a response. Southeastern filed its response on March 23, 2005, and Miller filed a reply brief on March 30, 2005. The circuit court held a hearing on April 4, 2005, and entered a final order of summary judgment on June 27, 2005.

Southeastern argues that, pursuant to Rule 56, both parties should have been allowed to file supplemental supporting materials for an additional fourteen-day period after March 23rd, when Southeastern's response was filed. This would have been until April 6th. In addition, Southeastern argues that Rule 56 did not authorize the circuit to hold a hearing until April 20th, or fourteen days after April 6th. We disagree with Southeastern's interpretation of Rule 56.

First, Rule 56 states that the *"moving party* may serve a reply and supporting materials within 14 days after the response is served." Ark. R. Civ. P. 56(c)(2). The moving party, Miller, served its reply on March 30, 2005. Second, Rule 56 states that the

court "*may* hold a hearing on the motion not less than 14 days after the time for serving a reply." The rule does not *require* the court to hold a hearing, but *allows* the court to hold a hearing. This court has held that a hearing on a motion for summary judgment is not mandatory. *See, e.g., Campbell v. Bard*, 315 Ark. 366, 868 S.W.2d 62 (1993). Furthermore, had Southeastern not requested and been granted an additional month within which to file its response, the hearing date, according to the time limits set forth in the rule, would have been on March 23rd, the day Southeastern filed its response. The hearing was held on April 4th, almost two weeks later. Finally, Southeastern has not alleged that it suffered any prejudice, and we can find none. *Keenan v. American River Transp. Co.*, 304 Ark. 42, 799 S.W.2d 801 (1990) (court held absent prejudicial error, reversal was not warranted).

■ Southeastern argues that the purpose of the time restrictions is to ensure that the parties are provided adequate time to present the necessary evidence and argument and to ensure that the court is provided adequate time to review and consider the evidence and argument. Here, Southeastern was given an extra month to present necessary evidence and argument. Southeastern has not identified any evidence or argument it was unable to submit. Moreover, while a hearing is not required, the circuit court held a hearing. Finally, the circuit court did not enter a final order until almost three months after the hearing. Under the circumstances, we fail to see how Southeastern was prejudiced by the circuit court's actions and reject its argument. We hold that both parties were provided adequate time to present evidence and argument, and that the court was provided adequate time for review.

## II. Merits of Summary Judgment

For its remaining points on appeal, Southeastern argues that the circuit court erred in granting Miller's motion for summary judgment because there are material issues of fact on each of its claims. Therefore, Southeastern claims, summary judgment was not appropriate, and it is entitled to present its case to a jury.

Summary judgment should be granted only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Riverdale Development Co. v. Ruffin Building Systems Inc.*, 356 Ark. 90, 146 S.W.3d 852 (2004); *Craighead Elec. Coop. Corp. v. Craighead County*,

352 Ark. 76, 98 S.W.3d 414 (2003); *Cole v. Laws,* 349 Ark. 177, 76 S.W.3d 878 (2002). The burden of sustaining a motion for summary judgment is the responsibility of the moving party. *Pugh v. Griggs,* 327 Ark. 577, 940 S.W.2d 445 (1997). Once the moving party has established a *prima facie* entitlement to summary judgment, the non-moving party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidence presented by the moving party in support of its motion leaves a material fact unanswered. *George v. Jefferson Hosp. Ass'n Inc.,* 337 Ark. 206, 987 S.W.2d 710 (1999). We view the evidence in the light most favorable to the non-moving party, resolving all doubts and inferences against the moving party. *Adams v. Arthur,* 333 Ark. 53, 969 S.W.2d 598 (1998). Keeping this standard in mind, we will review each of Southeastern's claims.

### A. Causation

Southeastern first challenges Miller's argument that, as a matter of law, Miller's actions did not cause Southeastern to sell to O'Conner. Miller argues that all of Southeastern's claims fail because causation is an essential element of each claim. Miller claims that the only injury Southeastern has asserted for each cause of action is that, once it made the decision to sell, it was forced to sell to O'Conner and received less than what it would have absent Miller's bad conduct. Thus, argues Miller, even assuming Miller's conduct violated the statutes and common law as claimed by Southeastern, unless Miller *caused* Southeastern to accept the O'Conner contract, it was not the cause of Southeastern's injury, and therefore the claims must be dismissed as a matter of law. Miller asserts that Freeman admitted that the reason he stopped negotiating with other buyers and accepted O'Conner's offer was because he ran out of time due to Southeastern's financial problems. Therefore, Miller argues, it did not *cause* Freeman to sell to O'Conner; Southeastern's financial distress caused Freeman to sell to O'Conner.

Southeastern responds, claiming that its attempts to market its business were thwarted by Miller's representations to it and to potential purchasers that it would only approve a sale to O'Conner. Southeastern asserts that the evidence demonstrates that Southeastern's distressed financial condition was caused by Miller. Southeastern supports its position with our longstanding

law that causation is almost always a question of fact for the jury and not appropriate for summary judgment. *See Miller Brewing Co. v. Ed Roleson, Jr., Inc.*, 365 Ark. 38, 223 S.W.3d 806 (2006); *Coca-Cola Bottling Co. v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003); *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002).

In this case, Southeastern has provided deposition testimony that Freeman sold his business, not because he decided to sell, but because Miller told him to sell. There is also testimony that Miller's representatives told Southeastern and others that the only purchaser Miller would approve was O'Conner. Southeastern produced letters written by Miller telling potential purchasers that Miller preferred for distributorships to be sold to existing Miller distributors and that there were no distributorships for sale in Southeastern's geographic area. Finally, evidence exists that Miller threatened to withdraw Southeastern's credit or terminate Southeastern's distributorship if it did not agree to sell to O'Conner. That Miller disputes many of these facts makes it apparent that there is a material issue of fact regarding causation.

We hold that Southeastern has demonstrated that there is a material issue of fact regarding why it sold to O'Conner and how Southeastern ended up in financial distress. Causation is generally a question of fact best left to a jury, and Miller has not persuaded us that this case presents an exception to that general rule.

### B. Statutory Claims

#### 1. Arkansas Franchise Practices Act

Southeastern alleges that the circuit court erred in granting summary judgment on its claim under the Arkansas Franchise Practices Act (the "Franchise Act").[2] Specifically, Southeastern alleged in its complaint that Miller did not act in good faith and violated the following provision of the Franchise Act:

> It shall be a violation of this subchapter for any franchisor, through any officer, agent, or employee to engage directly or indirectly in any of the following practices:

---

[2] Ark. Code Ann. §§ 4-72-201 to 210 (Repl. 2001).

. . .

(6) To refuse to deal with a franchise in a commercially reasonable manner and in good faith[.]

Ark. Code Ann. § 4-72-206 (Repl. 2001).

Southeastern suggests that Miller's acts in preapproving O'Conner and refusing to approve a buyer other than O'Conner were commercially unreasonable and not in good faith. Miller's response is that this claim fails because Southeastern did not meet the statutory requirements to trigger Miller's obligation to review or approve any potential buyers other than O'Conner.[3] Therefore, Miller argues, Southeastern's claim that Miller acted commercially unreasonably and in bad faith for failing to approve any other buyers fails as a matter of law.

We stated in *Miller Brewing Co. v. Ed Roleson, Jr., Inc.*, 365 Ark. 38, 223 S.W.3d 806 (2006) (*"Ed Roleson"*), that whether Miller dealt with the franchise in that case in a commercially reasonable manner and in good faith under the Franchise Act was a question of fact. In *Ed Roleson*, a Miller franchisee, Roleson, claimed that Miller violated the good-faith provision of the Franchise Act by adopting and executing a plan to eliminate Roleson as a distributor and by applying pressure to other distributors in furtherance of that plan. *Id.* Roleson presented evidence to support this claim in the form of internal Miller documents and testimony indicating that Miller prevented Roleson from purchasing other distributors to expand its business and increase its revenues, which, as Miller admitted at trial, was critical to Roleson's ability to remain competitive in the beer market. We held that "a franchisor's attempt to force a franchisee out of business may constitute a refusal to deal with a franchise in a commercially reasonable manner and in good faith under Ark. Code Ann. § 4-72-206(6)." *Id.*

In this case, Southeastern claims that Miller prevented it from selling its business to any purchaser other than Miller's

---

[3] Miller relies on Ark. Code Ann. § 4-72-205 (Repl. 2001), which states as follows:

(a) It shall be a violation of this subchapter for any franchisee to transfer, assign, or sell a franchise or interest therein to another person unless the franchisee first notifies the franchisor of that intention by written notice, setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification, and business experience during the previous five (5) years.

preferred purchaser for less than fair market value. It provided the following deposition testimony to support its position. Richard Metcalf testified that while interested in Southeastern, he never made an offer because Young told him that Miller would prefer to approve an existing Miller distributor as the purchaser of Southeastern. Freeman testified that Young told him not to waste his time submitting letters of intent from potential purchasers other than O'Conner because Miller wanted O'Conner to purchase Southeastern. Freeman also testified that, after Miller cut off Southeastern's credit, Young told him that Miller would reinstate credit if Freeman would work out a deal with O'Conner. Danny Frye, an employee of Southeastern, testified that Judy Stefanovitz, a Miller employee, told him in April that she thought that Miller had already decided that O'Conner was going to get the business. Finally, Lloyd Lee, a prospective purchaser of Southeastern, testified that Maddox of Miller told him that O'Conner was going to be the buyer regardless of what Freeman wanted, and it was a "done deal."

Southeastern's claim and supporting evidence suggests that the very issue in this case is whether Miller's actions in thwarting Southeastern's attempts to obtain offers other than O'Conner's violated Miller's duty under the Franchise Act. Miller has an obligation under the Act to deal with its franchise in a commercially reasonable manner and in good faith. Ark. Code Ann. § 4-72-205, cited by Miller, prevents a franchisee from transferring or assigning its franchise without notice to the franchisor. There is no question in this case that Miller had notice of the proposed transfer. The first question is whether Miller prevented Southeastern from obtaining offers from potential purchasers by forcing a sale to its preferred purchaser. The second question is if it did, did its conduct violate the Franchise Act? Ark. Code Ann. § 4-72-205 does not authorize Miller to disregard its obligation under Ark. Code Ann. § 4-72-206(6) to deal with its franchise in a commercially reasonable manner and in good faith.

■ Viewing the evidence in the light most favorable to Southeastern and resolving all doubts and inferences against Miller, we hold that Southeastern has presented proof demonstrating the existence of a material issue of fact on whether Miller's actions constituted a refusal to deal with a franchise in a commercially reasonable manner and in good faith under Ark. Code Ann. § 4-72-206(6). It is therefore entitled to submit this claim to a jury.

## 2. The Arkansas Beer Wholesaler's Act

Southeastern alleges that the circuit court erred in dismissing its claim under the Arkansas Beer Wholesaler's Act, found in Ark. Code Ann.§ 3-5-1101 through § 3-5-1111 (Repl. 1996) (the "Wholesaler's Act"), because it presented sufficient proof of a violation to submit to a jury. Specifically, Southeastern asserts that Miller violated Ark. Code Ann. § 3-5-1108, which provides in pertinent part:

> (a) Except as provided for in this subchapter, a supplier that has amended, modified, cancelled, terminated, or refused to renew any agreement; or caused a wholesaler to resign from an agreement; or has interfered with, prevented, or unreasonably delayed, or, where required by this subchapter, has withheld or unreasonably delayed consent to or approval of, any assignment or transfer of a wholesaler's business, shall pay the wholesaler reasonable compensation for the diminished value of the wholesaler's business including any ancillary business which has been negatively affected by the act of the supplier.

*Id.*

Southeastern claims that Miller violated this provision, first, by causing Southeastern to resign involuntarily from its Distributor Agreement and, second, by refusing to consider or approve prospective purchasers of its business other than O'Conner. It claims that Miller successfully forced Southeastern to sell and prevented it from obtaining a letter of intent from a qualified purchaser willing to pay fair market value, thereby allowing O'Conner to purchase it for significantly less than fair market value. Southeastern also contends that Miller violated Ark. Code Ann. § 3-5-1110 by refusing to consider or approve transferees who met all nondiscriminatory, material, and reasonable qualifications and standards for similarly situated wholesalers.

Miller's response is that this claim fails because Southeastern did not meet the statutory requirements to trigger Miller's obligation to review or approve any potential buyers other than O'Conner. Miller argues that Southeastern does not dispute that it never gave Miller the written notice and other information required by the Wholesaler's Act. Section 3-5-1108(a) specifically states that the statute applies "[e]xcept as provided for in this subchapter." *Id.*

The statutes upon which Miller relies provide:

A wholesaler shall not do any of the following:

. . .

(3)(A) Transfer the wholesaler's business without giving the supplier *written notice of intent to transfer* the wholesaler's business and, where required by this subchapter, receiving the supplier's approval for the proposed transfer.

Ark. Code Ann. § 3-5-1109(3) (Repl. 1996) (emphasis added).

A supplier shall not do the following:

. . .

(15) *Upon written notice of intent to transfer the wholesaler's business* other than to a designated member, withhold consent to or approval of, or unreasonably delay, not to exceed thirty (30) days after receipt of all material information reasonably requested, a response to a request by the wholesaler for any transfer of a wholesaler's business if the proposed transferee meets the nondiscriminatory, material, and reasonable qualifications and standards required by the supplier for similarly situated wholesalers[.]

Ark. Code Ann. § 3-5-1107(15) (Repl. 1996) (emphasis added).

The second provision of the Wholesaler's Act Southeastern is claiming that Miller violated is Ark. Code Ann. § 3-5-1110 (Repl. 1996). It provides in pertinent part:

(a)(1)(A) *Upon written notice of intent to transfer* the wholesaler's business, any individual owning or deceased individual who owned an interest in a wholesaler may transfer the wholesaler's business to a designated member, or to any other person who meets the nondiscriminatory, material, and reasonable qualifications and standards required by the supplier for similarly situated wholesalers.

(B) The consent or approval of the supplier shall not be required of any transfer of the wholesaler's business, including the assignment of the wholesaler's rights under the agreement, to a designated mem-

ber [or]⁴ shall not be withheld or unreasonably delayed to a proposed transferee who meets such nondiscriminatory, material, · and reasonable qualifications and standards.

Ark. Code Ann. § 3-5-1110(a) (Repl. 1996) (emphasis added).

Miller argues that these provisions clearly require the wholesaler to notify the supplier *in writing* in order to trigger the supplier's duty to approve a transfer. Southeastern admits that it submitted nothing in writing to Miller other than O'Conner's letter of intent, which Miller approved. Therefore, Miller claims that, as a matter of law, Southeastern may not pursue a claim under this Act for Miller's failure to approve applications Southeastern never properly submitted. We agree in part with Miller's interpretation of the Act.

 Miller's obligation under the Act to approve a transfer under both Ark. Code Ann. §§ 3-5-1108 and 1110 is conditioned upon Southeastern's submitting written notice of intent to transfer. Without this written notice, Miller has no duty under the Act to approve a transfer. Because Southeastern provided no written notice — other than the notice to transfer to O'Conner, which Miller approved — it has no claim against Miller for failure to approve a transfer. Accordingly, we affirm the circuit court's order granting summary judgment on Southeastern's claim under Ark. Code Ann. § 3-5-1110 and its claim under Ark. Code Ann. § 3-5-1108(a) regarding Miller's failure to approve prospective purchasers.

 However, the written-notice requirement does not bar Southeastern's claim under Ark. Code Ann. § 3-5-1108(a) for causing it to resign from the Distributor Agreement. We therefore reverse the circuit court's order granting summary judgment on Southeastern's claim under Ark. Code Ann. § 3-5-1108(a) alleging that Miller caused it to resign from the Distributor Agreement, and we remand for trial on that claim.

### C. Fraud

Southeastern alleges that the circuit court erred in granting summary judgment on its claim for common-law fraud and on its claim for fraud under the Franchise Act. For both claims, South-

---

⁴ *See* Act 8 of 1991, Section 6(A).

eastern argues that Miller falsely stated that O'Conner would be the only approved purchaser of Southeastern's business. Miller argues that Southeastern has failed to present evidence of a false representation of fact or of actual or justifiable reliance on any such representation. Miller contends that, at most, any statements regarding its intentions to approve a prospective purchaser were projections of a future event, not statements of fact, and therefore not actionable.

## 1. Fraud

Proof of common-law fraud requires a showing of five elements:

> (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance.

*Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002).

With regard to the first element, a false representation of material fact, Miller says that at best Young's statement that only O'Conner would be approved is a projection of a future event, not a fact. Projections of future events or conduct cannot support a fraud claim as a matter of law. *South County, Inc. v. First Western Loan Co.*, 315 Ark. 722, 727-28, 871 S.W.2d 325, 327 (1994). In denying a fraud claim alleging that defendants committed fraud by stating that they would provide certain financing, we stated "[a]ssuming arguendo that the statements were commitments to provide financing, they would only be promises of future conduct in a contractual setting and not misrepresentation[s] that give rise to fraudulent conduct." *Id.* We then quoted *P.A.M. Transport, Inc. v. Arkansas Blue Cross & Blue Shield*, 315 Ark. 234, 868 S.W.2d 33 (1993), in which we stated:

> In the context of negotiating a contract, a misrepresentation sufficient to form the basis of a deceit action may be made by one prospective party to another and must relate to a past event, or a present circumstance, but not a future event. "An assertion limited to a future event may be a promise that imposes liability for breach of contract or a mere prediction that does not, but it is not a misrepresentation as to that event."

*South County, Inc.*, 315 Ark. at 727-28, 871 S.W.2d at 327 (quoting *P.A.M. Transport, Inc., supra*).

█ Miller also argues that Southeastern has failed to present proof that it either actually or justifiably relied on this false statement. In fact, although Freeman alleged that Young first told him in March that Miller wanted him to sell to O'Conner and around May 1 that it would be a waste of time for Southeastern to submit other letters of intent, Freeman admitted that he continued to negotiate with other potential buyers and actively sought a better offer up until he signed the letter of intent with O'Conner on May 17, 2001. He also testified that, in spite of Young's statement, he would have submitted a better offer to Miller if he had received one. It does not appear that Southeastern relied on Young's alleged statement if Freeman was still negotiating to obtain a better offer from someone other than O'Conner. Southeastern either knew Young's statement was false or it was not relying on the statement. In either case, it has not submitted sufficient proof of fraud to demonstrate the existence of a material issue of fact. We affirm the circuit court's decision granting summary judgment in favor of Miller on Southeastern's fraud claim.

## 2. *Franchise Act*

Southeastern also claims that Miller violated the fraud provision in the Franchise Act found in Ark. Code Ann. § 4-72-207 (Repl. 2001). It provides in pertinent part as follows:

> (a) It shall be unlawful for any person, directly or indirectly, in connection with the offer, sale, purchase, transfer, or assignment of any franchise in this state to knowingly:
>
> (1) Employ any device, scheme, or artifice to defraud;
>
> (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading[.]
>
> (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

*Id.* Violation of this provision constitutes a Class B felony. *Id.* A franchisee who is injured by a violation of this provision may recover treble damages in a civil action under Ark. Code. Ann. § 4-72-208(a).

■ As we explained above, even if we accept as true Southeastern's allegation that Young told Freeman that Miller would not approve any prospective purchaser other than O'Conner, this was not a false statement of fact, but a promise or prediction of future conduct. Southeastern has failed to present sufficient proof to demonstrate the existence of a material fact on the issue of fraud under Ark. Code. Ann. § 4-72-208. We affirm the circuit court's decision granting summary judgment in favor of Miller on this claim.

### D. Tortious Interference with Business Expectancy

Southeastern's next claim is that it has demonstrated the existence of a material issue of fact on its claim for tortious interference with business expectancy, and therefore the claim should be submitted to a jury. Miller responds that it is legally incapable of tortiously interfering with the sale of Southeastern because Miller was the ultimate owner and source of the distribution rights that were the core asset Southeastern was selling. For that reason, Miller argues, it is a party to the contract, and "a party to a contract . . . cannot be held liable for interfering with the party's own contract." *Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 959, 69 S.W.3d 393, 405 (2002).

Southeastern replies that the alleged interference on the part of Miller is not with Southeastern's expectancies arising out of its own contract with Miller, but with its expectancy with regard to the sale of its business to the highest qualified purchaser. Southeastern claims that Miller was not a "party" to those expectancies. We agree.

■ Southeastern has identified at least two business expectancies with which it alleges Miller interfered. The Lee group and the Walker group, both of whom made written offers, were in active negotiations to purchase Southeastern. In spite of its claim to the contrary, Miller was not a "party" to those negotiations and would not have been a party to any contract entered into because of those negotiations. While Miller would have had a role in a sale transaction had such a transaction occurred, its role was merely to approve the transfer of Southeastern's right to distribute Miller products. This right was one of the assets being sold by Southeastern. We therefore reject Miller's claim that it was a party to the contract with which it allegedly interfered and reverse the circuit court's order granting summary judgment on this claim.

### E. Civil Conspiracy

Finally, Southeastern argues that the circuit court erred in granting summary judgment on its civil-conspiracy claim. Miller argued to the circuit court and continues to argue here that there can be no civil-conspiracy claim because there is no underlying actionable tort. Specifically, Miller argues that, because Southeastern's claims for tortious interference, fraud, and violation of statutes failed, there is no underlying actionable tort upon which to base a claim for civil conspiracy.

■ Because we have reversed the circuit court's order granting summary judgment on Southeastern's claims under the Franchise Act and the Beer Wholesaler's Act and its claim for tortious interference, we reject Miller's argument that there is no underlying actionable tort. We reverse the circuit court's order granting summary judgment on Southeastern's civil-conspiracy claim.

In accordance with our opinion, we hold that the circuit court erred in granting summary judgment in favor of Miller on Southeastern's claims under Ark. Code Ann. § 4-72-206(6) and Ark. Code Ann. § 3-5-1108(a), as limited herein, its claim for tortious interference, and its claim for civil conspiracy. We reverse and remand for trial on those claims. We affirm that part of the circuit court's order granting summary judgment in favor of Miller on Southeastern's claim for fraud and on its claim under the Wholesaler's Act as described herein.

Affirmed in part; reversed and remanded in part.