RUSSELL v. WILLIAMS.

4-5423                                                126 S. W. 2d 614

Opinion delivered March 27, 1939.

*Bush & Bush,* for appellant.

*McRae & Tompkins,* for appellee.

HOLT, J. Appellees, Letha Mae Williams and J. J. Williams, her husband, brought this action in the Nevada chancery court against Verna O. Russell and Arthur, Ozell, Dorothy and Herbert Russell, as the widow and heirs at law of Elmore W. Russell, deceased. Elmore W. Russell was the brother of appellee, Letha Mae Williams.

The complaint alleged ''That plaintiffs on or about April 1, 1934, entered into an oral partnership contract with E. W. Russell, deceased, by the terms of which plaintiffs agreed to move from Chicago to Nevada county and agreed to take charge of the mercantile business owned by the said Russell at Falcon, Arkansas, run the store, keep the books, look after the details connected with the cotton ginning business of the said E. W. Russell, and also the details and accounts of the farms owned and operated by the said Russell, so as to permit the said Russell to devote his time to the buying, selling and dealing in real estate, timber and mineral rights in southwest Arkansas, and the plaintiffs under said contract were to receive one-half of the profits and bear one-half of the losses accruing from said store and arising from trading and speculating in real estate, timber and mineral rights; but were to receive no interest in the profits of running the gin or the proceeds of the farms at that time owned and operated by the said Russell.''

That appellees moved to Falcon on April 1, 1934, and proceeded to comply with the partnership agreement; that the title to all real estate, timber and mineral interests acquired by Elmore Russell for the benefit of the firm was taken in his name; that as the result of said understanding and contract plaintiffs and the said E. W. Russell carried out their joint enterprise of running the store, buying and selling real estate, timber and mineral interests and dividing

the profits during the remaining part of 1934 and all of 1935 and 1936 and until the 19th day of August, 1937, when the said E. W. Russell was injured in an automobile accident from which he died on September 7, 1937; that all of the debts of said partnership have been paid. That said partnership acquired lands and mineral interests specifically described in the complaint, but referred to in the briefs as the Fletcher and Warren lands, the Nabors lease and the Peasley place. Interest in these properties formed the basis of plaintiffs' (appellees') suit. Plaintiffs sought to recover one-half interest in these properties in accordance with the partnership agreement.

The defendants (appellants here) denied every material allegation in the complaint, specifically denied the partnership agreement and further alleged that if the partnership agreement existed it was oral and within the statute of frauds.

The material facts in this case are substantially as follows: Appellee, Letha Mae Williams, is the sister of Elmore Russell, who died September 7, 1937. In 1933 Letha Mae Williams was living in Chicago, Illinois, with her husband, J. J. Williams. At that time she was employed in a bank and her husband was working in a garage. Her brother, Elmore Russell, induced her and her husband to move to Falcon, Arkansas.

Mrs. Sherron testified that Elmore Russell told her of the partnership they had formed; that he had helped Mr. Williams get work on the highway and that his sister, with the help of his son's wife, was taking care of the store and that let him out where he could trade, buy timber or oil leases or anything he wanted to and that they had a fund that this all went through, what he made from the store and what he made from his trades being put into this fund.

J. W. Russell testified that Elmore told him at the time he (J. W. Russell) was writing to appellees that if they would come down to Falcon he would share the profits he made from his trading with them, that Elmore told him to tell them this in his letter to them.

Mrs. C. G. Moody testified: "Well, he (Elmore) made mention every time he would bring it up about their partnership and what the future held for them and how much better they were doing due to the fact that they did have the partnership business and he kept apologizing for taking them away from us. He said everything including Mr. Williams' outside earnings went into the business."

J. L. Russell testified that Elmore told him that he had a partnership with appellees in which they shared equally.

Mrs. Catherine Williams testified: "I assisted Mrs. Williams (appellee) to open a set of books. She set up an account on the first page of the cash journal purporting to cover the first ten months of the business and this statement was signed by Elmore Russell and Jas. J. Williams." That Mrs. Williams and Elmore Russell told her about the partnership as a basis to work from. "Q. Do you know of your own knowledge that what Jim Williams made on the outside went into the joint account? A. Yes, sir. Q. What did Elmore Russell tell you he was going to do? A. He was trading on the outside. Q. What was to go with any profits, any money or lands or minerals that he acquired? A. It went into the partnership. It was a partnership business." That the car was used by Elmore Russell on the outside, and the partnership account was paying for it. Williams and wife put into the business something over $400.

Appellant, Arthur Russell, son of E. W. Russell, deceased, and administrator of his estate, testified: "Q. Did he ever say anything to you about his relationship with them? A. Well, the store and the Warren royalty. Q. Well, what about the store, A. I understood they had a half interest in it. Q. What did he say about their interest, if any, in any real estate that he owned? A. I never did know anything about that. Q. Did you ever hear your father say that he intended to give them any interest in any royalties or any lands or interests that he owned? A. Yes, the Warren royalty and that place that was traded for that. Q. The Fletcher place? A. Yes, sir, the Fletcher place. Q. What did he say? A. He just said he meant to give them a cut on that. That is what he told me. Q. Did

you ever hear him say anything about giving them an interest in the Peasley place, or in the Peasley lease? A. I heard him say he was going to give them a cut in the lease.''

Letha Mae Williams testified: ''Before leaving Chicago to come to Falcon my husband and I each had steady employment. My brother, Elmore Russell, was very optimistic over the possibilities at Falcon. His letter was very much in detail about the possibilities down there. My husband and I finally decided to go to Falcon rather than to San Antonio because living expenses would be cheaper, and then the enthusiasm and belief that Elmore had in the oil possibilities and the tests that had been made, and the faith he had in it convinced us there was perhaps quicker success there than in San Antonio. After Jim and I came to Falcon and got started, Elmore wasn't around the store any to speak of. He began to trade on the outside, as he had hoped to do. ''Q. Now, was Elmore pleased with that relation down there, Mrs. Williams? A. He told me he was. . . . Q. Mrs. Williams, to what extent was Elmore familiar with every item on this joint account? A. He turned every item over to me, either gave the charge or the deposits he made or gave me the checks to go and deposit. Q. Was he thoroughly familiar with every item in this joint account? A. Every one of them. Q. As a matter of fact, did you not get practically all the information that went into the joint account from him? A. It was his outside information and earning together. The $600 debit for the Peasley land was run through the joint account because it was paid through the joint account. This $600 was half of the $1,200 balance due on the purchase money after the timber was sold. It was necessary for Elmore Russell and Mr. Speer to have a settlement after the lease was sold to the Texas Company for $1,980 because the partnership was entitled to one-half of the profit. I am familiar with the Fletcher and Warren transaction. The profits from the Fletcher trade went into the joint account.''

Mrs. E. W. Russell, widow of E. W. Russell, testified: ''Q. Mrs. Russell, I want you to tell the court what you know about any partnership agreement that your husband

had with Mr. and Mrs. Williams. A. Well, I don't know of any only the store. Q. You do know they went into the store on a fifty-fifty basis? A . Yes, sir. Q. Did Mr. Russell ever tell you that they had a partnership interest in any lands that he acquired? A. No. Q. Did Mr. Russell at any time indicate that he intended to give them an interest in certain pieces of royalty? A. Yes, sir. Q. What did he say about that? A. He said he was going to give them an interest in the Warren royalty and in the Fletcher royalty and an interest in the Peasley lease."

In addition to all this, on the second page of the joint account book appears the following entries: June 24, E.W.R. ½ Peasley land, $600; June 24, E.W.R. ½ Peasley oil lease, $990; June 24, E.W.R. ½ Exp. and taxes due J.E.S. (meaning J. E. Speer) $25.58. The record reflects that the Peasley land cost $4,000. According to the testimony of Mrs. Williams, the timber cut off the land paid all of the purchase price but $1,200. The land was bought by J. E. Speer and E. W. Russell, each to have a one-half interest, and the $600, one-half of the balance, $1,200, due by E. W. Russell was paid by the partnership and was the $600 entry above referred to. Then a lease was sold for $1,980 and the $990 entry above was one-half of this lease money. The other entry, $25.58, "expense and taxes," was for one-half the taxes and expenses, the other half being paid by J. E. Speer.

On this state of the record, the trial court found that the plaintiffs (appellees here) about April 1, 1934, entered into a partnership contract with Elmore Russell, deceased; that all debts of the partnership had been paid and as a result of the joint efforts of plaintiffs and Elmore Russell, said partnership acquired as profits of the partnership the property in question here. From this decree comes this appeal.

Appellants earnestly insist, (1) that even if the oral contract of partnership was made as alleged, it was within the statute of fraud (§ 6059, Pope's Digest) and void in so far as it related to an undivided interest in the land and mineral rights sued for; and (2) that there is no written evidence and no competent oral testimony that the alleged partnership was ever formed. We can-

not agree with appellants on either of these contentions. We think that the findings of the chancellor that an oral partnership agreement was made and entered into, as alleged, is not against the preponderance of the evidence. We think this oral evidence in connection with the book account entries, signed by the parties, as this record reflects, amply support appellees' contention that a partnership agreement was entered into.

We are also of the opinion that the statute of frauds does not apply in this case. We think the preponderance of the testimony is to the effect that a partnership was formed by the parties for the purpose of buying and selling land, leases and royalties before any of the property in question was purchased, and that they were buying for speculation only and were not buying lands or leases to keep but for the purpose of selling them at a profit.

This court in *Cain* v. *Mitchell,* 179 Ark. 556, 17 S. W. 2d 282, said: "Real estate purchased for partnership purposes, paid for with partnership funds, and held and used as partnership property, will be treated as personalty for the purpose of the partnership, and as partnership property, regardless of the manner or by what agency it is bought and in whose name the title is held. The holder of the legal title will be considered a trustee for the partnership."

The rule of law governing cases of this character is well stated in *Chester* v. *Dickerson,* 54 N. Y. 1, 13 Am. Rep. 553, wherein the court said: "Most of the conflict in the authorities has arisen in controversies about the title to the real estate after the dissolution of the partnership or the death of one of the partners. But suppose two persons, by parol agreement, enter into a partnership to speculate in lands, how do they come in conflict with the statute of frauds? No estate or interest in land has been granted, assigned or declared. When the agreement is made no lands are owned by the firm, and neither party attempts to convey or assign any to the other. The contract is a valid one, and in pursuance of this agreement they go on and buy, improve and sell lands. While they are doing this, do they not act as partners and bear a partnership relation to each other?

"Within the meaning of the statute in such case neither conveys or assigns any land to the other, and hence there is no conflict with the statute. The statute is not so broad as to prevent proof by parol of an interest in lands; it is simply aimed at the creation or conveyance of an estate in lands without a writing. If there was a parol agreement in this case before the written one, it was just like the one embodied in the writing, to-wit, a partnership to purchase, lease and take refusals of land and then sell, lease or work them for the joint benefit of the parties. This is not a controversy about the title to any of the lands taken or owned by the partners, but it simply relates to the conduct of the defendants while they were acting as partners; and in such a case the statute of frauds certainly can present no obstacle to relief."

Again in *Thompson* v. *McKee,* 43 Okla. 243, 142 Pac. 755 L. R. A. 1915A, 521, we find in the syllabus: "An oral partnership agreement to share in the profits and losses arising from the purchase and sale of real estate is not within the statute of frauds; and the existence of such partnership, and the interest of the members of the firm therein, may be established by parol evidence.' ' This court in *Beebe* v. *Olentine,* 97 Ark. 390, 134 S. W. 936, (quoting syllabus) held: "A verbal agreement between two persons whereby they agree to buy certain lands jointly and to divide the profits from a resale thereof is not within the statute of frauds."

We have carefully examined the case of *O'Bryan* v. *Zuber,* 168 Ark. 613, 271 S. W. 347, cited and relied upon by appellants; however, we are of the opinion that it does not control here.

On the whole case we conclude that the decree of the chancellor was correct, and accordingly it is affirmed.