# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1670

_____

Virgil Shelton,

           Appellee,

v.

Kennedy Funding, Inc.,

           Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  Eastern District of Arkansas.
\*
\*
\*

_____

Submitted: February 10, 2010
Filed: September 24, 2010

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

This appeal arises out of the sale of an Arkansas cemetery. A jury awarded the cemetery's seller, Virgil Shelton, $1,675,000 on his breach-of-contract and fraud claims against Kennedy Funding, Inc. (KFI). KFI appeals. We affirm in part, reverse in part, and remand for reduction of Shelton's judgment to $675,000.

---

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

# I. BACKGROUND

## A. Factual Background[2]

### 1. Shelton Sells Rest in Peace to Acklin

In 1967, Shelton established the Rest in Peace Cemetery (Rest in Peace) at Hensley, Arkansas. Rest in Peace was a success. Shelton operated Rest in Peace for nearly a quarter of a century until he decided to retire.

In 1992, Shelton sold Rest in Peace to Willie Acklin, a local undertaker. Acklin was experienced in the funeral business and had brought many burials to Rest in Peace. Acklin could not afford to pay cash for Rest in Peace, and Shelton wanted to minimize his tax liability. Acklin executed a promissory note (Note) in Shelton's favor in exchange for the title to Rest in Peace. Acklin also gave Shelton a mortgage (Mortgage) on Rest in Peace to secure Acklin's obligations under the Note.

Acklin's obligations under the Note were extensive and enduring. Acklin promised to (1) pay Shelton and his two children $50,000 immediately; (2) pay $100,000 to Shelton and his children in four semi-annual installments starting in 1992; (3) "beginning February 1, 1993[, pay Shelton] an amount equal to . . . the income derived [from Rest in Peace's] perpetual trust fund"[3] on a quarterly basis for the life of Acklin or his wife, whichever was longer; and (4) pay Shelton, his wife, or their heirs and assigns, approximately $5,000 a month for twenty years. The Note forbade

---

[2]We recite the facts in the light most favorable to the jury's verdicts and afford Shelton all reasonable inferences. See In re Prempro Prods. Liab. Litig., 586 F.3d 547, 568-69 (8th Cir. 2009). We focus on the principal players in the underlying dispute and ignore the irrelevant complexities and minutiae of their transactions.

[3]Rest in Peace is a perpetual care cemetery. Shelton customarily deposited a percentage of the revenue earned from the sale of each burial plot into a trust fund to finance Rest in Peace's upkeep *in aeternum*. When Shelton sold Rest in Peace to Acklin, the trust fund had a balance of $250,000 and typically generated $12,000 *per annum* from interest and investments.

prepayment without Shelton's consent, because Shelton planned on "using [Rest in Peace] as a retirement plan."

### 2. Acklin Seeks a Bridge Loan

Acklin made payments on the Note for nearly a decade. In the late 1990s, Acklin encountered financial difficulties, including a "very big IRS problem," after a failed attempt to expand his funeral business into Tennessee. Acklin had tried to capitalize on gang-related violence in Memphis but, according to KFI, "ran into stiff competition from existing establishments." Acklin apprised Shelton "he was going to restructure his financing" and seek a bridge loan until he might secure more conventional terms.

KFI, an unregulated, non-bank private lender from New Jersey, expressed a willingness to provide Acklin a bridge loan. KFI styles itself as "America's leading hard money lender, specializing in bridge loans for commercial property . . . workouts, bankruptcy and foreclosures" and as "the lender of last resort." KFI boasts "flexibility and speed," using "creative financing expertise" and an "international network of private lenders [to] let[] borrowers with assets get the hard money commercial loans they need incredibly fast." KFI advertises the ability to close on a $100 million loan in less than two weeks. KFI fully collateralizes all of its loans—typically offering to lend up to 50% to 60% of the value of a prospective debtor's assets.

### 3. Estoppel Certificate

Before committing to a bridge loan, KFI sought to clarify Acklin's obligations to Shelton. KFI demanded Rest in Peace as collateral, but it was impossible to determine the amount due under the Note to Shelton. The value of the Mortgage was incalculable because Acklin had promised in the Note to make payments for a term of uncertain duration—the life of Shelton or his wife, whichever was longer. KFI was unwilling to loan Acklin a large sum without ascertaining the amount owing under the

Note, because Shelton's Mortgage would have priority over any mortgage Acklin might give KFI.

KFI asked Shelton whether he would waive his rights as first mortgage holder. Shelton refused. KFI then queried whether Shelton would sign an "estoppel certificate."[4] KFI wanted Shelton to reduce the value of the Mortgage to a sum certain and attest to certain facts about Rest in Peace's title.

KFI, Acklin, and Shelton negotiated the terms of an estoppel certificate. Shelton agreed to reduce the value of his Mortgage to a sum certain, $675,000. The sticking point in the negotiations was whether KFI would place $675,000 in an escrow account and, in the event Acklin defaulted on his loan to KFI, pay off the Mortgage. KFI drafted an estoppel certificate that did not provide for an escrow account, but simply stated, "KFI will have the right to pay off the [Mortgage] in part or in full, upon the default of [Acklin], at any time." This proposal was unacceptable to Shelton, who insisted KFI set up an escrow account for his benefit.

On January 22, 1999, Shelton signed a revised estoppel certificate (Estoppel Certificate). In relevant part, the Estoppel Certificate provided:

> [Shelton] is the Mortgagee under that certain Mortgage between [Acklin and Shelton concerning Rest in Peace]. Shelton acknowledges [KFI] intends to make a $2,200,000.00 loan to [Acklin] . . . , that the [KFI-Acklin] Loan will be secured by a second mortgage on [Rest in Peace]

---

[4]An estoppel certificate is "[a] signed statement by a party (such as a . . . mortgagee) certifying for another's benefit that certain facts are correct." *Black's Law Dictionary* 591 (8th ed. 2004). "A party's delivery of [an estoppel certificate] estops that party from later claiming a different set of facts." Id.; see, e.g., Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 472 (2006) (referencing use of an estoppel certificate to facilitate bank financing); JCA P'ship v. Wenzel Plumbing & Heating, Inc., 978 F.2d 1056, 1058 (8th Cir. 1992).

-4-

(subordinate to the Mortgage) and that KFI will hold in an escrow account the amount of $675,000.00, the amount needed to satisfy [the Mortgage]. Upon the default of [Acklin], or payment of the loan in full, KFI will pay said sum into a trust or other tax deferred account designated by agreement between [Acklin] and Shelton. Said account is to serve as a substitution of collateral for said mortgage. Upon payment of the amount of $675,000.00[,] Shelton will release his lien on [Rest in Peace]. Prior and as a condition to such funding, KFI must have assurances as to the status of the loan.

Accordingly, and in consideration of the payment of some or all of the obligations of [Acklin] to Shelton by KFI, . . . Shelton hereby certifies[:]

1) As of January 14, 1999, the outstanding principal and interest balance of the Loan is not more than $675,000.00.

2) To the best knowledge of the undersigned, no default exists under the Mortgage or any other documents executed and delivered in connection with the Loans . . . and no event has occurred which, with notice or the passage of time or both would constitute a default under the Mortgage[] or Loan Documents.

3) The Mortgage and Loan Documents have not been modified, amended or supplemented. A true and accurate copy of the Note is annexed hereto.

4) The Mortgage is the only security given by [Acklin] to Shelton for the Loan.

Shelton and his family members also signed an Affidavit of Facts attesting to the circumstances surrounding Rest in Peace's incorporation, which KFI required to complete the bridge loan.

KFI did not respond to Shelton upon receipt of the Estoppel Certificate or notify Shelton the Estoppel Certificate was unacceptable. KFI never signed the Estoppel

Certificate. Like the version KFI drafted, the Estoppel Certificate only contained a blank line for Shelton's signature and no signature block for KFI.

### 4. KFI Loans $2.2 Million to Acklin

In late January 1999, KFI closed on a $2.2 million bridge loan to Acklin. Acklin accepted steep terms, including a non-refundable 10% "commitment fee" and a laddered interest rate, which rose to as high as 36%. KFI agreed to hold $675,000 "in reserve . . . , to be applied, at [KFI]'s sole discretion, on [Rest in Peace]."

When finalizing the bridge loan, KFI provided its closing agent with a U.S. Department of Housing and Urban Development Form 1 Settlement Statement (Settlement Statement). The Settlement Statement itemized the costs associated with the bridge loan. Consistent with the Estoppel Certificate, the Settlement Statement calculated a $2.2 million loan from KFI to Acklin, with $675,000 of the principal to be disbursed to Shelton.

KFI's closing agent was prepared to disburse the $675,000 to Shelton, but the day before the loan closed one of KFI's attorneys, Rochelle Moskowitz, appended a "sticky note" to the Settlement Statement. The "sticky note" cautioned, "The $675,000 . . . is not being funded at closing. It's being held by KFI in the event of default or refinance by [Acklin]." The closing agent only dispersed approximately $1.1 million to Acklin—$2.2 million in principal, minus $675,000 in reserve[5] and approximately $400,000 in fees and prepaid interest. KFI never placed the $675,000 in an escrow account for Shelton's benefit.

---

[5]KFI never possessed the $675,000 "reserve" even though Acklin paid a 10% commitment fee on the entire $2.2 million loan. Ordinarily KFI lacks any cash reserves. One of KFI's executives testified that, with respect to each of its bridge loans, KFI acts as the agent for a group of co-lenders. Acklin's co-lenders, including Kamikaze Trading, LLC, Amalgamated Sludge, LLC, and two pension funds, never sent KFI the $675,000, but instead were "ready to fund it."

KFI used the Shelton Estoppel Certificate in conjunction with its bridge loan to Acklin. In April 1999, KFI sent the Internal Revenue Service (IRS) a copy of the Estoppel Certificate after the IRS requested documentation of the loan. In 2001, KFI submitted the Estoppel Certificate as part of its application for title insurance on Rest in Peace. KFI's closing agent falsely represented to the title company that "Counsel for [KFI] is holding the sum of $675,000.00 in trust for the benefit of [Shelton]. These funds were withheld by [KFI] at closing."

### 5.    Acklin Defaults

In 2000, Acklin defaulted on his bridge loan, and KFI initiated foreclosure proceedings on Rest in Peace. Delays in grave digging at Rest in Peace prompted its Board to place Rest in Peace in receivership.

Relying upon the substitution of collateral provision in the Estoppel Certificate, Shelton initially did not exercise his own foreclosure rights as first-priority mortgagee.[6] Shelton believed the $675,000 escrow account afforded him security and, for financial reasons, preferred not to foreclose on the Mortgage.

Shelton did not verify the creation of the $675,000 escrow account and, for many years, did not inquire about its status. When KFI initiated foreclosure proceedings, Shelton assumed KFI would "be coming to settle off" the Mortgage, but Shelton "never heard from" KFI. When Shelton mentioned the escrow account to

---

[6]Shelton eventually asserted a first-priority mortgage position in the foreclosure proceedings, which KFI contested. The Arkansas Court of Appeals upheld Shelton's interest. See Kennedy Funding, Inc. v. Shelton, 264 S.W.3d 555, 556-59 (Ark. Ct. App. 2007). Shelton later foreclosed and, in 2008, received a nearly $1 million judgment. While this appeal was pending, the Arkansas Court of Appeals affirmed this judgment, as well. See Kennedy Funding, Inc. v. Shelton, No. CA 09-79, ___ S.W.3d ___, ___, 2010 WL 1988276, at *4 (Ark. Ct. App. May 19, 2010).

KFI's local counsel, Garland Binns, counsel assured Shelton at a Board meeting that Shelton "would get all of [Shelton's] money, plus interest, plus attorney's fees."

In July 2001, Acklin defaulted on the Note. In March 2002, Shelton asked KFI for an "update" on the status of the $675,000 escrow account and indicated he would "accept the $675,000 (plus interest) in return for the satisfaction of the [Mortgage]." KFI notified Shelton that KFI had not placed $675,000 in an escrow account, but rather, in purported accordance with the Acklin-KFI loan agreement, "the reserve was not established and [Acklin's] obligations . . . were reduced." KFI refused to pay Shelton the $675,000.

### B.     Procedural Background

In September 2002, Shelton filed a two-count complaint against KFI in Arkansas state court. In Count I, Shelton claimed breach of contract. Shelton alleged the Estoppel Certificate embodied a contract. In Count II, Shelton claimed "fraud or constructive fraud." Shelton asserted KFI "occupied a position of superior knowledge and . . . had a duty to speak or to otherwise inform [Shelton] of the fact the 'escrow' had not been funded" and "knew [Shelton] relied on affirmative representations to the effect the escrow was set up and allowed [Shelton] to continue such reliance to his detriment."

In October 2002, KFI removed the case to federal court. See 28 U.S.C. §§ 1332, 1441 and 1446. Shelton is a citizen of Arkansas, KFI is a citizen of New Jersey, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

In March 2009, after nearly seven years of wrangling,[7] the district court held a five-day jury trial on Shelton's complaint. The jury returned verdicts in Shelton's favor for (1) breach of contract, (2) fraud, and (3) constructive fraud. The jury awarded Shelton $675,000 in compensatory damages and $1 million in punitive damages. The district court entered judgment in accordance with the jury's verdicts and ordered Shelton to assign "[a]ll of his right, title, and interest" in Rest in Peace to KFI upon payment of the judgment.

At the close of Shelton's case in chief, at the close of all of the evidence, and after trial, KFI moved for judgment as a matter of law or, in the alternative, for a new trial. See Fed. R. Civ. P. 50 and 59. The district court summarily denied all of KFI's motions, and KFI now appeals.

## II.    DISCUSSION

KFI contends there is insufficient competent evidence in the record to support the jury's verdicts, and thus the district court erred in denying KFI's motions for judgment as a matter of law. With respect to Count 1, Shelton's breach-of-contract claim, KFI argues enforcement of any promises in the Estoppel Certificate against KFI violates the Arkansas Statute of Frauds. As to Counts 1 and 2, KFI argues Shelton adduced insufficient evidence to prove all the elements of his breach-of-contract and fraud claims, respectively. KFI also maintains there is insufficient evidence of malice in the record to sustain the jury's $1 million punitive damages award. In the alternative, KFI asks for a new trial on any of Shelton's surviving claims in light of

---

[7]In September 2006, a district judge presided over two days of trial on the complaint. On September 7, 2006, in the midst of trial, KFI and Shelton announced they had settled. The district judge dismissed the case with prejudice. In November 2006, a disagreement arose over the settlement's terms. Upon the district judge's death in April 2007, the clerk reassigned the case to a second district judge. In December 2007, the second district judge found the parties never reached a settlement agreement, reopened the case, and ordered a new trial.

the district court's exclusion of one of KFI's proposed witnesses, "coercion" of a stipulation, and refusal to instruct the jury on mitigation of damages.

### A. Motion for Judgment as a Matter of Law
#### 1. Standard of Review

"We review a district court's denial of a motion for judgment as a matter of law de novo." Quigley v. Winter, 598 F.3d 938, 946 (8th Cir. 2010) (quoting Heaton v. The Weitz Co., 534 F.3d 882, 887 (8th Cir. 2008)). "We must affirm the jury's verdict[s] unless, after viewing the evidence in the light most favorable to [Shelton], we conclude that no reasonable jury could have found in [his] favor." Id. "We will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict." Id.

#### 2. Breach of Contract
##### a. Arkansas Statute of Frauds

The Arkansas Statute of Frauds prohibits enforcement of certain oral or unsigned contractual agreements. In relevant part, the Arkansas statute provides:

> (a) Unless the agreement, promise, or contract, or some memorandum or note thereof, upon which an action is brought is made in writing and signed by the party to be charged therewith, or signed by some other person properly authorized by the person sought to be charged, no action shall be brought to charge any:
>
> . . . .
>
> (2) Person, upon any special promise, to answer for the debt, default, or miscarriage of another; [or]
>
> . . . .
>
> (4) Person upon any contract for the sale of lands, tenements, or hereditaments, or any interest in or concerning them[.]

Ark. Code Ann. § 4-59-101. The Arkansas Statute of Frauds mirrors the English Statute of Frauds, 29 Chas. II, c. 3 (entitled "An Act for the Prevention of Frauds and Perjuries"), which Parliament enacted in 1677. See, e.g., Sims v. Roberts, 68 S.W.2d 1001, 1002 (Ark. 1934) ("Our statute is a re-enactment of the English Statute of Frauds.").[8]

KFI stresses it never signed the Estoppel Certificate. Characterizing Shelton's breach-of-contract claim as an attempt to "charge [KFI] upon [a] special promise, to answer for the debt, default, or miscarriage of another," Ark. Code Ann. § 4-59-101(a)(2) (the surety prong), or "charge [KFI] upon [a] contract for the sale of lands . . . , or any interest in or concerning them," Ark. Code Ann. § 4-59-101(a)(4) (the real estate prong), KFI concludes any alleged promises on its part in the Estoppel Certificate are unenforceable under the surety and real estate prongs of the Arkansas Statute of Frauds. Shelton denies either prong applies. In the alternative, Shelton maintains the "promissory estoppel exception" takes KFI's promises in the Estoppel Certificate outside the Arkansas Statute of Frauds, because Shelton relied upon those promises to his detriment.

---

[8]The corresponding portions of the English Statute of Frauds provided:

> [N]o action shall be brought . . . (2) . . . whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriages of another person; . . . (4) or upon any contract or sale of lands, tenements or hereditaments, or any interest in or concerning them; . . . (6) unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

English Statute of Frauds § 4 (reprinted in Restatement (Second) of Contracts, ch. 5 Statutory Note (1981)).

The district court, finding the statute of frauds did not apply, never explained why the Estoppel Certificate falls outside the surety or real estate prongs of the Arkansas Statute of Frauds. KFI raised the statute-of-frauds issue in its motion for summary judgment, but the district court rejected KFI's argument without elaboration. When KFI re-raised the statute-of-frauds issue at the close of Shelton's case in chief, the district court tentatively "f[ound] by a preponderance of evidence that the Statute of Frauds does not bar the claims." The court elaborated on its ruling the next day. Assuming without deciding the Estoppel Certificate fell within at least one of the two proffered prongs, the district court held:

> Even if the contract is unenforceable, [Shelton] reasonably relied upon [KFI's] promise to his detriment. [Shelton] honestly and reasonably believed he performed all that was required of him. That is enough to trigger the promissory estoppel exception and take this agreement out of the statute of frauds. Accordingly, I find by clear and convincing evidence that the statute of frauds does not apply to the parties' alleged contract and will not give any jury instructions relating to the statute of frauds.

We may affirm the district court on any ground finding support in the record. See, e.g., Zoltec Corp. v. Structural Polymer Group, 592 F.3d 893, 895 (8th Cir. 2010) (avoiding the issue of whether the economic loss doctrine barred recovery on a fraud claim because the allegations in the plaintiff's complaint were not sufficiently plausible to survive Fed. R. Civ. P. 12(b)(6) scrutiny). We choose to examine the threshold question the district court never answered, that is, whether the Estoppel Certificate falls within the surety or real estate prongs of the Arkansas Statute of Frauds. Whether a promise falls within a statute of frauds is a question of law for the court. See Gen. Trading Int'l, Inc. v. Wal-Mart Stores, Inc., 320 F.3d 831, 835-36 (8th Cir. 2003) (applying Arkansas law).

### i. Surety Prong

The Estoppel Certificate does not fall within the surety prong of the Arkansas Statute of Frauds. Although we may infer the jury found KFI promised in the Estoppel Certificate "to answer for the debt, default, or miscarriage of" Acklin, the Arkansas Supreme Court has indicated that not all such promises fall within the plain language of the Arkansas Statute of Frauds. The surety prong of the Arkansas Statute of Frauds only applies when the would-be surety does not receive new consideration for his promise. See, e.g., Patten v. Robbs, 300 S.W. 388, 389 (Ark. 1927) ("[A] subsequent promise by a third person to pay the pre-existing debt of another must be in writing and signed in order to bind the obligor, unless the promise is made for a new consideration."); Powell v. Jones & Son, 281 S.W. 366, 367 (Ark. 1926) (holding consideration for a new promise took an agreement outside the surety prong of the Arkansas Statute of Frauds); Burgie v. Bailey, 121 S.W. 266, 268 (Ark. 1909) (similar). The Arkansas Court of Appeals summarized the law as follows:

> All oral undertakings to answer for the debt of another are not unenforceable under the [Arkansas Statute of Frauds]. A promise by a third party to discharge a preexisting debt of another, without any new consideration or benefit passing to him, is a "collateral" understanding and unenforceable under the [Arkansas Statute of Frauds]. However, notwithstanding the [Arkansas Statute of Frauds], such a contract is an "original" one and enforceable if founded on new consideration or benefit moving to the promisor. In determining whether the undertaking is collateral or original the court should consider the words of the promise, the situation of the parties, and all circumstances surrounding the transaction.

Landmark Sav. Bank, F.S.B. v. Weaver-Bailey Contractors, Inc., 739 S.W.2d 166, 168 (Ark. Ct. App. 1987). The Arkansas Supreme Court's construction of the surety prong of the Arkansas Statute of Frauds is consistent with its English ancestry, which was designed to prohibit proof of gratuitous or sentimental promises and to forestall the attendant dangers of perjury. See Blackstone's Commentaries on the Laws of

-13-

England (1765), at 376; see also N.Y. Trust Co. v. Eisner, 256 U.S. 345, 349 (1921) ("[A] page of history is worth a volume of logic.").

Any promise by KFI in the Estoppel Certificate to place $675,000 in an escrow account and pay that sum into a trust or tax-deferred account upon Acklin's default would not be gratuitous or sentimental, i.e., collateral to Acklin's obligations in the Note and Mortgage. KFI received new consideration for its promises, namely, certain assurances from Shelton, including (1) a written concession that the value of the Mortgage was not more than $675,000, and (2) waiver of the Note's non-prepayment clause. See Landmark, 739 S.W.2d at 168 (defining consideration "as any benefit conferred or agreed to be conferred upon a promisor to which he is not lawfully entitled, or any prejudice suffered or agreed to be suffered by a promisee other than that which he is lawfully bound to suffer"). There is no evidence KFI wished to help Shelton for gratuitous or sentimental reasons. KFI clearly made a business decision and sought to profit from the fees and interest Acklin would pay on the bridge loan.[9]

---

[9]Corbin elaborates:

> In some cases . . . the nature of the bargain supplies relatively unambiguous evidence supporting the assertion that the defendant's promise was made, as well as indicating a fair equivalence in the values exchanged at the time of the [defendant's] promise. If, in addition, the occasion does not invoke the statute's cautionary function because the promise was manifestly induced by other than gratuitous or sentimental purposes, there is little reason to bar enforcement of the oral promise, even though it may be one "to answer for the debt of another." [There is an implicit] exception to the statute where the primary inducement for the promise lies not in the promisor's wish to secure an advantage for the third party, but in a pecuniary or economic advantage to the promisor sufficient to satisfy the objectives of the statute.

4 Corbin on Contracts § 16.1 (rev. ed. 1997) (citations omitted).

-14-

Because KFI received new consideration for its promises, the Estoppel Certificate does not fall within the surety prong of the Arkansas Statute of Frauds. See Patten, 300 S.W. at 389; Landmark, 739 S.W.2d at 168.

### ii.    Real Estate Prong

We also conclude the Estoppel Certificate, which in relevant part essentially obligates KFI to pay off the Mortgage in the event of Acklin's default on the bridge loan, does not fall within the real estate prong of the Arkansas Statute of Frauds. Although the parties do not cite any cases on point, in Riley v. Atherton, 47 S.W.2d 568, 568 (Ark. 1932), the Arkansas Supreme Court held that an oral or unsigned agreement to satisfy a mortgage does not fall within the Arkansas Statute of Frauds. "The reason for the rule is . . . that a mortgage is a mere security for a debt, and the property may be released from the mortgage by parol agreement, or by a written one." Id. (internal marks omitted). See also Schlumpf v. Shofner, 196 S.W.2d 747, 749-50 (Ark. 1946) (holding an oral agreement by a second mortgagee to purchase the first mortgage and permit the mortgagor to redeem the first mortgage did not fall within the real estate prong of the Arkansas Statute of Frauds, because "such agreement [is] not . . . regarded as a contract for the sale of land or a transfer of title thereto").

Not every oral or unsigned agreement relating to real estate falls within the real estate prong of the Arkansas Statute of Frauds. See, e.g., Russell v. Williams, 126 S.W.2d 614, 617-18 (Ark. 1939) (holding an oral agreement to create a partnership to speculate in lands did not fall within the statute of frauds); Johnson v. Bellmont, 291 S.W. 77, 80 (Ark. 1927) (holding an oral agreement relating to an oil lease did not fall within the statute of frauds). "The statute is not so broad as to prevent proof by parol of an interest in lands; it is simply aimed at the creation or conveyance of an estate in lands without a writing." Russell, 126 S.W.2d at 617 (quoting Chester v. Dickerson, 54 N.Y. 1, 13 (1873)); cf. Ozan Lumber Co. v. Price, 244 S.W.2d 486, 486-88 (Ark. 1951) (holding an oral agreement to purchase timber fell within the statute of frauds). The Estoppel Certificate neither creates nor conveys an estate in

-15-

land and, therefore, does not fall within the real estate prong of the Arkansas Statute of Frauds.

### iii.     Summary

Because the surety and real estate prongs do not apply, the Arkansas Statute of Frauds does not bar enforcement of KFI's unsigned promises in the Estoppel Certificate. We need not decide whether the promissory estoppel exception removes such promises from the Arkansas Statute of Frauds, which is ordinarily a question of fact for the jury. See Dickson v. Delhi Seed Co., 760 S.W.2d 382, 388 (Ark. Ct. App. 1988).

### b.     Sufficiency of the Evidence

To establish the existence of a contract, Shelton had to show "(1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations." DaimlerChrysler Corp. v. Smelser, 289 S.W.3d 466, 470 (Ark. 2008). A "meeting of the minds" as to all material terms is required, and "the terms of a contract cannot be so vague as to be unenforceable." Id.; see also Crain Indus., Inc. v. Cass, 810 S.W.2d 910, 915-16 (Ark. 1991) (cautioning that the phrase "meeting of the minds" must be understood under the "objective theory" of Arkansas contract law). KFI argues there is insufficient evidence of consideration and mutual agreement, and insists the Estoppel Certificate terms are too vague.

### i.     Consideration

There is sufficient evidence of consideration. As we previously indicated, Shelton agreed to reduce the value of the Mortgage to a sum certain and waived the Note's non-prepayment clause. See Landmark, 739 S.W.2d at 168.

### ii.     Mutual Agreement/Acceptance

There is also sufficient evidence of mutual agreement notwithstanding KFI's insistence it never accepted Shelton's revisions to its original draft estoppel certificate.

Although KFI never signed the Estoppel Certificate or told Shelton, "I accept all of the terms of the Estoppel Certificate," KFI's **conduct** manifested its acceptance. See Childs v. Adams, 909 S.W.2d 641, 646 (Ark. 1995) (holding conduct manifested acceptance of a counter offer); MDH Builders, Inc. v. Nabholz Constr. Corp., 17 S.W.3d 97, 100 (Ark. Ct. App. 2000) ("Acceptance of a contract may be accomplished by words or conduct."). A reasonable jury could find KFI (1) relied on Shelton's representations in the Estoppel Certificate when closing on the bridge loan; (2) included the Estoppel Certificate on the Settlement Statement; (3) sent the Estoppel Certificate to the IRS; and (4) used the Estoppel Certificate to obtain title insurance on Rest in Peace.

The jury was not required to credit the self-serving testimony of Matthew Cole, KFI's Vice President, who testified KFI never accepted Shelton's terms in the Estoppel Certificate. See Ciba-Geigy Corp. v. Alter, 834 S.W.2d 136, 145 (Ark. 1992) (holding the jury was free to disbelieve self-serving testimony regarding lack of mutual assent). KFI's conduct was powerful evidence that belied Cole's testimony. We reject KFI's suggestion, repeated throughout its briefs, that Moskowitz and others representing its interests acted *ultra vires*, because we find sufficient circumstantial evidence in the record from which a reasonable jury could infer KFI's agents at all times acted within the scope of their authority. See Sterne, Agee & Leach, Inc. v. Way, 270 S.W.3d 369, 375-76 (Ark. Ct. App. 2007) (stating agency may be a question of fact proven through circumstantial evidence).

### iii.    Definiteness

The Estoppel Certificate's terms were not too vague. KFI argues the Estoppel Certificate "was simply too vague and indefinite for there to be a meeting of the minds," citing the Estoppel Certificate's failures to identify an escrow agent or define certain terms and phrases. Even though the Estoppel Certificate may not be a model

of clarity,[10] we hold a reasonable jury could find the document's terms were sufficiently definite to impose an obligation upon KFI to place $675,000 in an escrow account for Shelton's benefit in the event Acklin defaulted on the bridge loan. That is all Arkansas law requires. See DaimlerChrysler, 289 S.W.3d at 470 (limiting the vagueness inquiry to whether "[t]he terms of [the] contract . . . provide a basis for determining the existence of a breach and for giving an appropriate remedy").

The district court did not err in denying KFI's motion for judgment as a matter of law as to Shelton's breach-of-contract claim.

### 3.    Fraud

To prove fraud, Shelton was required to show: (1) KFI "made a false representation of material fact"; (2) KFI "knew that the representation was false or that there was insufficient evidence upon which to make the representation"; (3) KFI "intended to induce action or inaction by [Shelton] in reliance upon the representation"; (4) justifiable reliance; and (5) damages. Jewell v. Fletcher, No. 09-313, ___ S.W.3d ___, ___, 2010 WL 1726129, *___ (Ark. Apr. 29, 2010); accord MFA Mut. Ins. Co. v. Keller, 623 S.W.2d 841, 842-43 (Ark. 1981) (referring to the second element as "scienter"). KFI argues Shelton failed to prove a false representation or justifiable reliance.

Shelton maintains a reasonable jury could find KFI made a false representation to Shelton when Binns, KFI's local counsel, assured Shelton that Shelton would receive all of his money, plus interest and attorney fees.[11] Shelton points out KFI's

---

[10]The title "Estoppel Certificate" is a misnomer. The Estoppel Certificate was much more than a traditional estoppel certificate—Shelton's revisions transformed the document into a contract.

[11]At oral argument and in his opening brief, Shelton disclaimed any other theory of fraud. The gravamen of Shelton's fraud claim is Binns's statement at the Board meeting. Shelton does not claim KFI entered into the negotiations over the Estoppel

-18-

local counsel, Binns, made the statement in the midst of foreclosure proceedings and with the knowledge (1) KFI had not funded an escrow account with $675,000; (2) Shelton reasonably believed KFI had done so; and (3) Shelton "was doing nothing to protect his interests," but instead was "allowing [KFI] to take the lead in reliance on the protection he thought he had." Shelton avers a reasonable jury could conclude Binns made the statement with the intent to induce Shelton into refraining from asserting his first-priority rights under the Mortgage.

Even when viewed in context of KFI's then-pending foreclosure proceedings, Binns's statement that Shelton "would get all of [Shelton's] money, plus interest, plus attorney's fees" is insufficient as a matter of law to support a claim of fraud under the Arkansas common law. Shelton cites no legal authority in support of his defense of the jury's verdict. To the contrary, the Arkansas Supreme Court has indicated "[p]rojections of future events or conduct cannot support a fraud claim as a matter of law." Se. Distrib. Co. v. Miller Brewing Co., 237 S.W.3d 63, 74 (Ark. 2006). Experience teaches that defaulting debtors often know more about their own financial situations than their creditors and yet assure those creditors they will make good on their debts and "pay up." We anticipate the Arkansas Supreme Court would not countenance a fraud claim under such common circumstances. "'An assertion limited to a future event may be a promise that imposes liability for breach of contract . . . , but it is not a misrepresentation as to that event.'" Id. (quoting S. County, Inc. v. First Western Loan Co., 871 S.W.2d 325, 327 (Ark. 1994)).

The district court erred in denying KFI's motion for judgment as a matter of law as to Shelton's fraud claim.

---

Certificate intending to breach its terms, although he does not rule out the possibility KFI had such an intention.

### 4.     Constructive Fraud

"Under Arkansas law, constructive fraud applies only in certain limited situations." TEC Floor Corp. v. Wal-Mart Stores, Inc., 4 F.3d 599, 602 (8th Cir. 1993). Constructive fraud "is defined as a 'breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declared fraudulent because of its tendency to deceive.'" Johnson v. Cincinatti Ins. Co., 289 S.W.3d 407, 413 (Ark. 2008) (quoting Davis v. Davis, 725 S.W.2d 845, 847 (Ark. 1987)). While proof of "actual dishonesty," "intent to deceive," or "any moral wrong or evil intention" is not required, Davis, 725 S.W.2d at 847, the doctrine of constructive fraud is inapplicable "[a]bsent special circumstances or a special relationship between the parties," TEC, 4 F.3d at 602 (applying Arkansas law). See also Archer-Daniels-Midland Co. v. Beadles Enters., 238 S.W.3d 79, 83-84 (Ark. 2006) (referring to "[a] confidential or special relationship between parties [that] gives rise to a duty to speak and clarify information upon which others might rely"). To prove constructive fraud, Shelton was required to establish KFI had a duty "to speak and clarify misinformation upon which [Shelton] might rely." SEECO, Inc. v. Hales, 22 S.W.3d 157, 172-73 (Ark. 2000).

The district court instructed the jury that it might find constructive fraud if Shelton proved "something more than an arms-length business relationship" existed between KFI and Shelton in which KFI "occupied a special position of confidence or trust with [Shelton]." Without citing any legal authority, Shelton opines "[c]onstructive fraud may exist where a party is in a place of superior knowledge." Shelton reiterates that, when Binns spoke to Shelton, KFI "knew Shelton reasonably believed [KFI] had complied with its obligations under [the Estoppel Certificate]."

In almost every transaction, one party has superior knowledge as compared to the other's knowledge. For constructive fraud to apply, there must be more, such as a special relationship of trust.

-20-

The law of constructive fraud in Arkansas is murky. See Beatty v. Haggard, 184 S.W.3d 479, 486 (Ark. Ct. App. 2004) (referring to parts of the law of constructive fraud as "confusing"). While it would appear there is some support for Shelton's position, see Lane v. Rachel, 389 S.W.2d 621, 624 (Ark. 1965) (holding a buyer of a residential home adduced sufficient evidence of constructive fraud, where the seller failed to disclose the home's structural defects); Beatty, 184 S.W.3d at 486-87 (similar), governing precedent forecloses his argument. Where, as here, two sophisticated creditors deal with one another at arms length, and one creditor knows more than the other creditor in part because of the latter's failure to make a reasonable inquiry, the former does not have a duty to disclose or clarify information upon which the latter might rely. See, e.g., Union Nat'l Bank of Little Rock v. Farmers Bank, Hamburg, Ark., 786 F.2d 881, 887 (8th Cir. 1986) (applying Arkansas law and finding insufficient evidence of a special relationship or special circumstances to support a constructive fraud claim under Arkansas law, where "[t]he record shows that commercial bankers on both sides entered into an arms-length transaction and that Union did not seek out available information regarding the note") (cited with approval by Kinkead v. Union Nat'l Bank, 907 S.W.2d 154, 160 (Ark. Ct. App. 1995)); TEC, 4 F.3d at 602 (similar); cf. Marsh v. Nat'l Bank of Commerce of El Dorado, 822 S.W.2d 404, 407-08 (Ark. Ct. App. 1992); SEECO, 22 S.W.2d at 172-73 (deciding there was sufficient evidence of a special relationship where evidence in the record showed defendant owed a fiduciary duty to plaintiffs, certain royalty owners). In the rough-and-tumble of business dealings among sophisticated creditors, the law does not require a competitor to show all of its cards.

The district court erred in denying KFI's motion for judgment as a matter of law as to Shelton's constructive fraud claim.

### 5. Punitive Damages

Shelton does not argue his breach-of-contract claim independently supports an award of punitive damages. "The Arkansas Supreme Court . . . ruled in [L.L. Cole &

Son, Inc. v. Hickman, 665 S.W.2d 278, 281 (Ark. 1984),] that tort claims must be separated from breach of contract claims, and that if punitive damages are sought, they are dependent on the success of the tort claims." Delta Rice Mill, Inc. v. Gen. Foods Corp., 763 F.2d 1001, 1006 (8th Cir. 1985). Therefore, the jury's $1 million award of punitive damages cannot stand.[12] We need not address KFI's argument that the district court erred in submitting Shelton's request for punitive damages for want of actual malice.

### B.    Motion for New Trial
#### 1.    Standards of Review

"A district court's decision to admit or exclude testimony is reviewed for an abuse of discretion." Quigley, 598 F.3d at 946. "A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was a clear and prejudicial abuse of discretion." Id. (quoting U.S. Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 689-90 (8th Cir. 2009)). Similarly, we afford the district court "broad discretion in instructing the jury." Ernster v. Luxco, Inc., 596 F.3d 1000, 1004-05 (8th Cir. 2010). We "revers[e] only if, 'when viewed in their entirety, the jury instructions contained an error or errors that affected the substantial rights of the parties.'" Id. (quoting Ryther v. KARE 11, 108 F.3d 832, 846 (8th Cir. 1997) (en banc)).

#### 2.    Analysis
#### a.    Leighton

In conjunction with its rulings on a series of motions in limine, the district court prohibited Michael Leighton, a partner in the New Jersey law firm of Cole, Schotz, Meisel, Forman & Leonard, P.A. (Cole Schotz firm), from testifying at trial on KFI's

---

[12]Reversal of Count 2 does not affect the jury's award of $675,000 in compensatory damages. At oral argument, KFI conceded the fate of Count 2 would not impact the jury's award of compensatory damages in the event we affirmed on Count 1.

behalf. Leighton's associate, Joseph Barbiere, entered an appearance in this action for KFI, but withdrew his representation on the last business day before trial.[13] The parties agree an attorney generally may not testify on behalf of a party in Arkansas when a member of his firm is representing that party. See Int'l Res. Ventures, Inc. v. Diamond Mining Co. of Am., Inc., 934 S.W.2d 218, 221 (Ark. 1996); Aetna Cas. & Sur. Co. v. Broadway Arms Corp., 664 S.W.2d 463, 467 (Ark. 1984). KFI argues this rule is inapplicable here, because (1) Barbiere had a very limited role in the litigation and (2) the district court granted Barbiere leave to withdraw before trial commenced.

At trial, KFI did not renew its objection to the exclusion of Leighton's testimony or make a formal offer of proof. In conjunction with its requests *in limine* for permission to call Leighton to the witness stand, KFI did file an affidavit. In the affidavit, Leighton outlined the substance of his proposed testimony. Leighton indicated he would testify (1) he was lead counsel for KFI on the bridge loan, was "familiar with all of the loan documents[,] and [could] testify as to their negotiation, execution and context with respect to [the bridge] loan"; (2) "[n]o attorney in [his] firm had any authority to bind [KFI] to any agreement"; (3) at an early juncture he had ordered Moskowitz, his associate, "to check with me on all negotiations, including . . . estoppel certificates"; (4) KFI never accepted the terms of the Estoppel Certificate; and (5) Moskowitz never "informed [Leighton] that she had supposedly approved an Estoppel Certificate . . . which would obligate [KFI] to establish an escrow account of $675,000, . . . payable to a trust selected by [Shelton] and [Acklin] in the event that Acklin defaulted on the terms of the loan."

KFI argues the district court abused its discretion in excluding Leighton's testimony. Shelton responds KFI's failure to make an offer of proof at trial is fatal.

---

[13]Barbiere filed his motion to withdraw on September 1, 2006, before the jury selection beginning on September 5, 2006. The first district judge granted the motion on September 5, 2006, but nonetheless barred Leighton from testifying. KFI had listed Leighton as an anticipated witness at trial in October 2004.

-23-

In the alternative, Shelton argues KFI cannot demonstrate sufficient prejudice to warrant reversal.

KFI was not required to make an offer of proof at trial to preserve error. "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(a); see, e.g., United States v. Collier, 527 F.3d 695, 699 (8th Cir. 2008).[14] After considering Leighton's affidavit, the district court excluded his testimony, characterizing its ruling as "definitive." Absent a material change in the facts and circumstances surrounding Leighton's proposed testimony—and we discern none here—an offer of proof would have been nothing more than an empty formalism. See Fed. R. Evid. 103 cmt. to 2000 amend. (advising that, "[w]hen the ruling is definitive, a renewed objection or offer of proof at the time the evidence is to be offered is more a formalism than a necessity," but cautioning definitiveness "is reviewed in light of the facts and circumstances before the trial court at the time of the ruling"). Empty formalism is a vacuum to be abhorred. See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 387 n.10 (2003) (avoiding "empty formalism").

Even if we assume the district court's exclusion of Leighton's testimony was error, any error was harmless. In various respects Leighton's testimony was cumulative, conclusory, or argumentative. The thrust of Leighton's testimony was that KFI did not accept the terms of the Estoppel Certificate. The jury apparently did not believe similar testimony from Cole, KFI's Vice President, because KFI's conduct contradicted Cole's words. We do not believe Leighton's testimony was "of such a

---

[14]A different rule prevailed in this circuit before the 2000 amendments to Fed. R. Evid. 103. See, e.g., Dupre v. Fru-Con Eng'g Inc., 112 F.3d 329, 336-37 (8th Cir. 1997) (holding that, notwithstanding obtaining a formal ruling on a motion in limine, a party's failure to make an offer of proof at trial waived any right to appellate review).

critical nature, that there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been admitted." Cavataio v. City of Bella Villa, 570 F.3d 1015, 1021 (8th Cir. 2009) (quoting Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008)).

### b.  Stipulation

During discovery, Shelton subpoenaed Moskowitz for a deposition in New York. Moskowitz failed to appear. Shelton later filed a motion to compel, which the district court denied. The district court denied the motion without prejudice because such motion should have been filed in New York, the forum in which the deposition was scheduled to take place. Shelton never re-filed his motion, and Moskowitz did not testify at trial.

In a motion in limine, KFI asked the court to bar Shelton from presenting any evidence regarding Moskowitz's failure to appear. KFI argued it should not be held responsible in the eyes of the jury for Moskowitz's failure to appear, because (1) Shelton never filed a motion to compel in the proper forum and (2) Moskowitz had quit the Cole Schotz firm before Shelton subpoenaed her. The district court granted the motion.

During trial, KFI produced Defendant's Exhibit 19, a set of "final escrow instructions" from Moskowitz to the closing agent for the bridge loan. KFI asserts Defendant's Exhibit 19 is a "key exhibit" that rebuts other evidence in the record tending to show KFI agreed to establish an escrow account for Shelton's benefit. Defendant's Exhibit 19 (1) does not contain instructions to the closing agent to fund the $675,000 escrow account, and (2) states it cannot be changed absent signed, written permission from KFI.

Defendant's Exhibit 19 has six pages. During trial, Shelton's counsel discovered Defendant's Exhibit 19 did not appear to be authentic—the first page is

dated "January 27, 1999," but the remaining five pages are dated "February 1, 1999." Faced with the discrepancy in dates, the district court ruled Defendant's Exhibit 19 should be excluded unless KFI agreed to allow Shelton to (1) voir dire the closing agent about the discrepancy, and (2) inform the jury, via stipulation, that Moskowitz failed to appear for her subpoena. The closing agent and Moskowitz probably were the only persons who could explain the discrepancy in dates and vouch for its authenticity, yet Moskowitz was unavailable.

KFI chose to permit voir dire and accept the stipulation. The parties stipulated to the jury that, "when [Moskowitz] was subpoenaed in the state of New York for her deposition and [the attorneys] went to New York to take it, she didn't show up for her deposition and refused to come . . . [but] in fairness . . . she was no longer working at the law firm at that point." And at the conclusion of trial, the district court instructed the jury:

> You may consider the failure of [Moskowitz] to honor the deposition subpoena in weighing her credibility in the exhibits admitted which were authored by her and in weighing the credibility where statements as related by witnesses who testified here in court.

KFI objected, arguing the district court's instruction was improper under Fed. R. Evid. 608(b) and 806(b). In the alternative, KFI argued the instruction should have been "modifie[d] . . . to include that a subpoenaed witness may be compelled to attend by [c]ourt order, but that [Shelton] did not file a motion seeking to enforce the subpoena."

KFI argues the district court erred in "coercing a stipulation that Moskowitz failed to appear for her deposition." KFI maintains the jury instruction "compounded this prejudicial error" by "plac[ing] undue emphasis on an irrelevant matter" and "misle[ading] the jury regarding the significance of [Moskowitz]'s absence."

-26-

The district court did not abuse its discretion. KFI's use of "[c]oercion" is hyperbole.[15] KFI was forced to make a difficult choice, but it is not unusual for a litigant to find itself between Scylla and Charybdis at trial, especially when the party places itself in peril. Any "coercion" was wholly self-inflicted. KFI presented the court with an exhibit that on its face appeared to be inauthentic. The exhibit's author had disobeyed a subpoena, failed to appear for her deposition, and was unavailable to testify at trial. It was reasonable and fair to permit Shelton to cross-examine the exhibit's recipient and inform the jury the exhibit's author—who worked for KFI when she drafted the exhibit—would not testify to explain the discrepancy in dates. Cf. Fed. R. Evid. 102 ("These rules shall be construed to secure fairness in administration . . . to the end that the truth may be ascertained and proceedings justly determined."); Baxter v. Palmigiano, 425 U.S. 308, 317-19 (1976); United Broad. Co. v. Armes, 506 F.2d 766, 770 (5th Cir. 1975) (citing C. McCormick, Law of Evidence § 249 (1954) and Wigmore on Evidence § 289 (1940)).

### c.      Mitigation

KFI argues Shelton could have mitigated his damages by promptly asserting his first-priority right to foreclose. Even if we assume the district court erred in failing to instruct the jury on mitigation, we conclude KFI did not suffer any discernible prejudice. In its closing argument, KFI argued to the jury that, before returning a verdict in Shelton's favor, it must measure damages as "if [Shelton] had filed foreclosure when he had the right to . . . and could have been made whole." KFI stressed the jury should not require KFI "to pay for [Shelton's] decision not to proceed when [Shelton] could have gotten his money." During its deliberations, the jury then asked the district court: "What kind of damages can the jury award to [Shelton] for the fraud if the jury decides in favor of [Shelton]?" Over Shelton's objection, the court instructed the jury: "You are limited to $675,000, *less any mitigation you may find.*"

---

[15]Although the district court colloquially referred to the stipulation as "coerced," the court later clarified, "[W]hen I say it was coerced, he wanted something else or didn't want something else and I told him to have it or not have it."

(emphasis added). An answer to a jury question is a supplemental jury instruction. See, e.g., United States v. Jenkins-Watts, 574 F.3d 950, 964 (8th Cir. 2009), cert. denied, 130 S. Ct. 1915 (2010). Although the district court's supplemental jury instruction did not define "mitigation," we do not believe under the unique circumstances of this case that KFI's substantial rights were affected. See Ernster, 596 F.3d at 1004-05.

## III.   CONCLUSION

We affirm in part, reverse in part, and remand for further proceedings not inconsistent with this opinion. We affirm the district court's judgment as to Count 1 and reverse as to Count 2. We remand to the district court with instructions to enter judgment in KFI's favor on Count 2 and vacate the jury's $1 million punitive damages award. The jury's $675,000 compensatory damages award stands.

_____